**CONSUMERS UNION OF UNITED STATES, INC., Plaintiff-Appellee,**

**v.**

**GENERAL SIGNAL CORP. and Grey Advertising, Inc., Defendants-Appellants.**

**Nos. 522, 541, Docket 83–7855.**

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1983.

Decided Dec. 6, 1983.

Rehearing and Rehearing En Banc Denied Feb. 14, 1984.*

Bruce D. Sokler, Washington, D.C. (Charles D. Ferris, Cameron F. Kerry, and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Washington, D.C.; Jules P. Kirsch, and Cooper, Dunham, Clark, Griffin & Moran, New York City, Joseph M. Burke, and Davis & Gilbert, New York City, on the brief), for defendants-appellants.

Michael N. Pollet, New York City (Marshall Beil, Carol A. Schrager, and Karpatkin Pollet Perlmutter & Beil, New York City, on the brief), for plaintiff-appellee.

Before TIMBERS, NEWMAN and CARDAMONE, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants General Signal Corporation and Grey Advertising, Incorporated, appeal from a preliminary injunction, entered on October 13, 1983 in the Southern District of New York, Henry F. Werker, *District Judge,* enjoining their broadcast of two television commercials for Regina lightweight vacuum cleaners which quoted from an issue of CONSUMER REPORTS published by appellee Consumers Union of United States, Inc. (Consumers Union or CU). The appeal presents important issues with respect to the interplay of the First Amendment commercial speech doctrine and the fair use defense to a claim of copyright infringement. Issues of trademark, privacy, and state law also are involved.

After a full review, we hold that a preliminary injunction should not have issued. Since we find that Consumers Union has established neither a probability of success on the merits of its copyright, trademark, or state privacy law infringement claims, nor a balance of hardships tipping decidedly in its favor, we vacate the injunction.[1]

## I.

CU publishes a monthly magazine, known as CONSUMER REPORTS, which summarizes its independent evaluations of various consumer products. CONSUMER REPORTS prints the following notice in each copy:

"**Consumers Union accepts no advertising** or product samples and is not beholden in any way to any commercial interest. Its Ratings and product reports are solely for the use of readers of CONSUMER REPORTS. Neither the Ratings nor the reports may be used in advertising or for any commercial purpose. CU will take all steps open to it to prevent such uses of its material, its name, or the name of CONSUMER REPORTS."

In its July 1983 issue, CONSUMER REPORTS evaluated lightweight vacuum cleaners. The Regina Powerteam was "check-rated" and effusively praised in the article. Models are check-rated when CU judges the product tested to be of high overall quality, low price, and appreciable superiority to the non-check-rated models examined. CONSUMER REPORTS' comments regarding this product included:

—"*Regina Power Team*—far ahead of the pack in cleaning ability."

1. In view of the urgency of the matter, on November 25, 1983 we entered an order reversing the order of the district court, vacating the preliminary injunction, directing that the mandate issue forthwith, and stating that an opinion would follow. This is that opinion.

—"[O]nly one model, the check-rated *Regina Power Team,* was an adequate substitute for a full-sized vacuum."

—"Only the *Regina Power Team* vacuumed the floor thoroughly."

—"The *Regina Power Team* also stood out in our carpet-cleaning test. It alone left the carpet presentable after only one sweep, pristine after two sweeps."

In addition to publication of this information in its magazine, CU distributed news reports summarizing its test results to between 300 and 400 newspapers, and broadcast it in a "Report to Consumers" over the CBS radio network.

The Regina Powerteam lightweight vacuum cleaner is marketed by the Regina Company (Regina), a division of appellant General Signal Corporation's wholly-owned subsidiary, the General Signal Appliance Corporation. As part of its marketing strategy, Regina and its outside advertising agency, Gray-North, Inc., a division of appellant Grey Advertising, Inc., prepared three half-minute commercial messages for broadcast on television. The first does not mention CONSUMER REPORTS and is not challenged in this litigation.

The second message, entitled "Squid", emphasizes the lightweight convenience of the Regina Powerteam compared to full size vacuums. During one of the many different visual portions of the message, the voice-over announcer states that the Regina Powerteam "is the only lightweight that Consumer Reports says, Quote, was an adequate substitute for a full-sized vacuum." The statement "Consumer Reports is not affiliated with Regina and does not endorse products" is superimposed on the screen the entire time the CONSUMER REPORTS quotation is mentioned. "Squid" was broadcast

on ABC, CBS, and NBC, starting September 27, 1983.

The third message, entitled "Consumer Reports", includes several quotations from CONSUMER REPORTS visually displayed on the screen as they are read by the announcer.[2] As with "Squid", each time material from CONSUMER REPORTS is mentioned, there appears the statement that it is not affiliated with Regina and does not endorse products. This disclaimer appears on the screen for a total of 14 seconds out of the 29.5 second duration of the commercial. The print size used for the disclaimer is comparable with normal television advertising practice for required disclosures and remains on the screen for a longer period of time than is normal for such disclosures. This commercial was never actually broadcast.

Regina notified CU that it planned to broadcast these commercials. It offered to provide copies to CU and to meet to discuss the matter. On the morning of September 30, 1983, Regina received a mailgram from CU demanding that Regina cease and desist from airing its commercials and established a deadline of 3:00 P.M. that day. Counsel for Regina responded but was told that CU already had commenced the instant action. CU's complaint alleged violations of the Copyright Act, 17 U.S.C. § 101 et seq. (1982); of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a) (1982); of state law, N.Y.Gen.Bus.Law §§ 349, 350, 350-a, 350-d, 368-d, 397 (McKinney 1968 & Supp.1982); and of common law.[3] CU demanded temporary and permanent injunctive relief, compensatory damages of not less than $5 million, and punitive damages of not less than $5 million.

On October 3, 1983, CU applied for a temporary restraining order. In its papers in support of this application, CU alleged

---

**2.** The commercials include the following lines with quoted excerpts from the CONSUMER REPORTS article:

  —"*Regina Powerteam—far ahead of the pack in cleaning ability.*"
  —Of all the lightweights tested "only one worked well."
  —On medium pile carpeting Powerteam "did the job with the least effort."

  —In fact, it's the only one Consumer Reports calls an "adequate substitute for a full-sized vacuum."

**3.** Only the Copyright Act, § 43(a) of the Lanham Act, and §§ 349, 350 and 397 of the New York General Business Law were pressed by CU in the district court.

that specific defects in the commercials had a misleading effect. The court granted the T.R.O. over Regina's objections.

Upon receiving CU's motion papers, Regina changed the commercials' disclaimer to state "Consumer Reports is not affiliated with Regina and does not endorse Regina products or any other products". This was to allay CU's concern that the initial wording of the disclaimer might convey the impression that, while CU generally did not endorse products, it had made an exception in Regina's case. Responding to CU's complaint, Regina also revised the voice-over of the "Squid" commercial to insert the word "unquote" at the end of the quotation attributed to CU, and changed the last visual of that message to eliminate pictures of Regina models other than the Powerteam.

On October 7, a hearing was held on the motion for a preliminary injunction. The court heard approximately one-half hour of argument. No testimony was taken. On October 14, the court entered a preliminary injunction enjoining the use of both Regina messages and other advertising which copied from CONSUMER REPORTS. In its opinion, the court reached only the copyright issues. It did not address the Lanham Act or state law claims. It summarily denied appellants' First Amendment defense and rejected the fair use defense after weighing the four statutory factors referred to below. The court held that a detailed showing of irreparable injury was unnecessary once the elements of copyright infringement had been established. This expedited appeal followed.

Appellants argue, first, that the commercials are a fair use of copyrighted material and that many of the references to CONSUMER REPORTS are facts not protected by copyright; second, that neither the Lanham Act nor state law provides a basis for enjoining a truthful and accurate report of CU's article; and, third, that Regina will sustain irreparable injury if the injunction remains in effect, that CU has proven no irreparable injury, and that the public interest is adversely affected by the injunction. We shall consider each of these arguments seriatim.

## II.

Since the district court reached its decision solely on the pleadings, briefs, affidavits, and counsels' arguments—without taking testimony—we have undertaken a full review to determine whether injunctive relief is appropriate. *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2 Cir.1979).

A preliminary injunction will issue only where the moving party "establishes possible irreparable injury and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206–07 (2 Cir.1979).

We shall consider first CU's claimed likelihood of success on the merits.

## A.

CU's copyright on the July 1983 issue of CONSUMER REPORTS has not been challenged. Some copying of copyrighted material, however, without the owner's consent is permitted. The fair use doctrine "balances the public interest in the free flow of ideas with the copyright holder's interest in the exclusive use of his work." *Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 242 (2 Cir.1983). Fair use is a codification of the decisional law in an effort to prevent rigid application of the Copyright Act where such application would unreasonably prevent the dissemination of information.

The Copyright Act states the fair use doctrine as follows:

"[T]he fair use of a copyrighted work, including such use by reproduction in copies ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright. In determining

whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for non profit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work."

17 U.S.C. § 107 (1982). Each of these factors contributes to the factual determination of what constitutes fair use. We shall consider each in turn.

### (1)

■ The first factor focuses on the purpose and character of the use. Although the purpose of Regina's use undoubtedly is commercial, this fact alone does not defeat a fair use defense. *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.,* 626 F.2d 1171, 1175 (5 Cir.1980). Almost all newspapers, books and magazines are published by commercial enterprises that seek a profit. *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 307 (2 Cir. 1966), *cert. denied,* 385 U.S. 1009 (1967).

The distinction between "commercial nature" and "non profit educational purposes" is merely illustrative of what is included in assessing the core of the criterion, which is the purpose and character of the use. Regardless of motive, the "character" of Regina's ads includes the conveyance to consumers of useful information which is protected by the First Amendment. As the Supreme Court recognized in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976), commercial uses also serve the important function of educating the public. The information

about lightweight vacuums in CONSUMER REPORTS is of significant public interest. Broadcast of Regina's ads will increase significantly the number of people exposed to CU's evaluation.[4]

Some infringement actions involve the copying of creative expression of a copyrighted work for the purpose of having that precise form of expression advance someone else's commercial interests—for example, using well-known copyrighted lines to attract attention to an advertisement. *D.C. Comics, Inc. v. Crazy Eddie, Inc.,* 205 U.S. P.Q. 1177 (S.D.N.Y.1979), cited with approval in *Warner Bros., supra,* 720 F.2d at 242. In some circumstances copying of that sort may not constitute fair use. On the other hand, in some circumstances an advertiser may copy some excerpts from a copyrighted work for the purpose of having the content of the work advance his commercial interests. Since the purpose is to report factual information, as in the instant case, it is more conducive to the concept of fair use.

### (2)

■ The second factor to be considered is the nature of the copyrighted work. CONSUMER REPORTS is primarily informational rather than creative. Since the risk of restraining the free flow of information is more significant with informational work, the scope of permissible fair use is greater. *Rosemont Enterprises, Inc. v. Random House, Inc., supra,* 366 F.2d at 307; 3 Nimmer on Copyright § 13.05[A][2] at 13-61 (1982).

Facts cannot be copyrighted. 17 U.S.C. § 102(b). CU cannot prevent Regina from accurately reporting facts about the results of CU's independent testing, irrespective of Regina's motive in doing so. Regina wants to communicate CONSUMER REPORTS' favorable rating of its product. Regina uses CU's words in the interest of accuracy, not piracy. Where an evaluation or description is being made, copying the exact words may be the only valid way precisely to report the

---

4. In addition to reaching a wider audience through television, repetition of CU's findings serves an information function. People tend to forget information presented in books and newspapers when it comes time to buy the item. Periodic advertising in connection with store displays presents the information in a form which aids retention.

evaluation. *Morrissey v. Procter & Gamble Co.,* 379 F.2d 675, 678–79 (1 Cir.1967).

In *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195 (2 Cir. 1983), we recently approved a fair use defense in a case involving President Ford's memoirs. Some of the article describing the Ford memoirs was paraphrased; other parts were taken verbatim from a pre-publication copy of the book obtained by Nation magazine. We held that the paraphrasing was not subject to Harper & Row's copyright because the content was factual and concerned a matter of great public importance. We also permitted use of actual quotations. Implicit in that decision is an acknowledgement that, where accurate reporting requires use of verbatim quotations, fair use will be liberally applied. The scope of the doctrine is undoubtedly wider when the information conveyed relates to matters of high public concern. But the doctrine has some application to communicating information pertinent to consumer choices.[5]

In truth, CU is not really objecting to Regina's copying CU's expression. The statement of policy in its magazine and its position in its brief before us is that *any* mention of CU in commercial advertising will diminish its effectiveness as an unbiased evaluator of products.[6]

(3)

The third factor to consider is the amount and substantiality of the portion used in relation to the copyrighted work as a whole. "Squid" uses one phrase; "Consumer Reports" borrows 29 words. In relation to the CONSUMER REPORTS magazine article (2100 words), both commercials make relatively insubstantial use of CU's work.

(4)

The fourth factor to consider in evaluating fair use is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor is "widely accepted to be the most important." *Triangle Publications v. Knight-Ridder Newspapers, supra,* 626 F.2d at 1177.

The district court accepted CU's argument and stated that "Regina's commercial use of the article could be the demise of Consumers Union since such commercial use could lead the public to view Consumers Union as [an] unfair tester of products." *Consumers Union of United States, Inc. v. General Signal Corp.,* 83 Civ. 7209 (S.D.N.Y. Oct. 12, 1983) at 11. We believe that this conclusion is based on a faulty premise. The Copyright Act was not designed to prevent such indirect negative effects of copying. The fourth factor is aimed at the copier who attempts to usurp the demand for the original work. *Wainwright Securities Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 96 (2 Cir.1977), *cert. denied,* 434 U.S. 1014 (1978); *Rubin v. Boston Magazine Co.,* 645 F.2d 80, 84 (1 Cir.1981); *Quinto v. Legal Times of Washington, Inc.,* 506 F.Supp. 554, 560 (D.D.C.1981). The copyright laws are intended to prevent copiers from taking the owner's intellectual property, *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562 (1977), and are not aimed at recompensing damages which may flow indirectly from copying.

---

**5.** Indeed, CU, recognizing the public interest in the flow of its information, has successfully invoked First Amendment protections to avoid its own liability for allegedly false product disparagement. *See Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189 (1 Cir.1982), *cert. granted,* 51 U.S.L.W. 3774 (Apr. 25, 1983).

**6.** We think CU's fear that consumers will assume that Regina purchased a CU endorsement is exaggerated, *see Consumers Union of United States, Inc. v. Hobart Manufacturing Co.,* 189 F.Supp. 275, 278–79 (S.D.N.Y.1960), and at least unsupported by the present record. Regina would not want to quote CU if that were an accurate depiction of public reaction. Regina benefits from public perception of CU as an unbiased evaluator.

Instead, Regina in effect is saying that it believes that the viewing public places great stock in what CONSUMER REPORTS has to say. In this way, the use of such statements and the credit given to CONSUMER REPORTS actually may reinforce a positive public perception of the magazine.

Our approach in literary criticism cases illustrates this distinction. A reviewer excerpts parts of a story and then severely criticizes it. The fourth fair use factor will come into play if too much is copied or if the entire plot is revealed, thereby usurping the demand for the original work. A court would not find it relevant in deciding the fair use question, however, that evidence might show that the devastating critique had diminished sales by convincing the public that the original work was of poor quality. Both instances of copying result in decreased sales and popularity of the original work, but only the former lies within the scope of copyright protection.[7] *Dow Jones & Co. v. Board of Trade of the City of Chicago*, 546 F.Supp. 113, 121 & n. 9 (S.D.N.Y. 1982); *The New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F.Supp. 217, 223 (D.N.J.1977) (presumption that use by a non-competitor will not injure market for copyrighted material); *Life Music, Inc. v. Wonderland Music Co.*, 241 F.Supp. 653, 656–57 (S.D.N.Y.1965) (a tighter standard of irreparable injury applies where works do not compete). The theory behind the copyright laws is that creation will be discouraged if demand can be undercut by copiers. Where the copy does not compete in any way with the original, this concern is absent.

Not only are we faced with a claim of injury which does not stem from competition between the copyright owner and the copier, but the owner does not even allege injury to any work currently copyrighted. Rather, it is the value of possible *future* issues of CONSUMER REPORTS which CU seeks to protect. This clearly does not involve

the fourth factor which focuses upon the effect of the use upon the potential market for or value of *the copyrighted work*. 17 U.S.C. § 107(4).

■ Applying the proper test to determine whether Regina's use usurps demand for the July 1983 CONSUMER REPORTS issue, we find no convincing evidence of a significant deleterious effect. Back issues are available for purchase, but probably few people would order the July issue solely because of its evaluation of lightweight vacuum cleaners. Those who do probably will not be deterred by watching Regina's commercials.

Based on our examination of the four statutory factors, we hold that CU has failed to establish likelihood of success on the merits and that the district court erred in holding that the Copyright Act warranted injunctive relief.

### B.

Although the district court relied solely on the Copyright Act in issuing a preliminary injunction, CU is entitled to assert its other claims in support of an injunction. *United States v. American Railway Express Co.*, 265 U.S. 425, 435 (1924). We turn first to CU's claims under the Lanham Act.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), proscribes both express and implied false representations made in connection with the sale of goods and renders the maker of any such representations liable to those damaged by the misrepresentations.[8] CU asserts that Regina's ads are false and misleading in three respects.

---

**7.** There are alternate forms of relief where copying results in a negative effect which is not an usurpation of plaintiff's original market. The only alleged injury which CU truly presses is that Regina's use may lead to public perception of *endorsement*. Truthful excerpting of CU's ratings cannot hurt CU *unless* the public perceives that CU sponsored the use. In such a case, § 43(a) of the Lanham Act and the privacy statutes which prevent unauthorized product endorsements are more appropriate. CU will have an opportunity to offer proof on this issue at trial and establish this aspect of its § 43(a) claim if it can.

**8.** 15 U.S.C. § 1125(a) provides:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to

First, it claims that the ads convey the false impression that CONSUMER REPORTS' review of the Powerteam was exclusively favorable.[9] Although CU check-rated the Powerteam, it did note that its dust-holding capacity was not good and found other minor defects.[10] The Lanham Act protects against distortion through selective excerpting. *Amana Refrigeration, Inc. v. Consumers Union of United States, Inc.,* 431 F.Supp. 324 (N.D.Iowa 1977). As a factual matter, however, Regina's ads do not convey the impression that CU's review was wholly favorable. Rather, they merely convey an accurate impression that CU concluded that the Powerteam lightweight vacuum was superior to others tested. CU virtually admits that the negative factors were of little consequence: the November issue of CONSUMER REPORTS lists the Powerteam as a "Best Buy Gift" with no negative qualifications.

Second, CU asserts that Regina's original ads conveyed the false impression that CU's favorable review applied to the entire Regina line, when in fact models other than the Powerteam were not rated so highly. We question the accuracy of this assertion. The Powerteam is the only machine shown and named during the commercial. A group picture of the other models flashes rapidly past the viewer's eyes only at the very end. In any event, Regina already has changed the commercial. The question, at least with respect to preliminary injunctive relief, is moot.[11]

Third, CU objects to the failure of the commercial announcer to close the quotation from CONSUMER REPORTS. Instead of saying "unquote" following the excerpt, the announcer continues with the rest of the commercial text. We think it unlikely that viewers would attribute to CU the voice-over statements "Why wrestle with an ordinary vacuum when there's Powerteam? One fine Electrikbroom cleaner from Regina". Again, Regina has changed the commercial to include the word "unquote"; so the issue is moot.

■ In addition to prohibiting false representations, § 43(a) of the Lanham Act also proscribes advertisements which are not technically false, but which lead to a mistaken public belief that "the mark's owner sponsored or otherwise approved the use." *Dallas Cowboys Cheerleaders, supra,* 604 F.2d at 205. A preliminary injunction will issue where an advertisement creates a reasonable likelihood of confusion by consumers regarding the origin or sponsorship of the product. *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc.,* 299 F.2d 33, 36 (2 Cir.1962); *Cuisinarts, Inc. v. Robot-Coupe International Corp.,* 509 F.Supp. 1036, 1044 (S.D.N.Y.1981).

On this record Regina's ads have not been shown to give rise to reasonable likelihood of confusion regarding source or sponsorship. The record is devoid of any evidence of actual confusion. The only evidence relating to consumer confusion is the conclusory affidavit of CU's own Executive Director. We are satisfied that the disclaimer is adequate to distance CU and Regina.

CU asserts that the visual disclaimer —"CONSUMER REPORTS is not affiliated with Regina and does not endorse Regina products or any other products"—cannot

---

any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

**9.** There is a conflict between CU's position here and with respect to its fair use claim: there, it argues that Regina has appropriated CU's entire product; here, it argues that Regina did not copy enough.

**10.** The original article in CONSUMER REPORTS faulted the Powerteam's capacity; gave it a "poor" rating in "edge cleaning" of medium pile carpets, in "initial suction", and in "emptying convenience"; and gave it a "fair" rating in noise and in cleaning bare floors and deep pile carpet.

**11.** Not only has Regina offered to change the commercial, but it has actually done so. CU's argument that an offer to change does not moot an injunction is inapposite.

cure the false public perception of an association between CU and Regina. CU argues that only a total ban on use of its name in advertising will achieve this objective.

Disclaimers are a favored way of alleviating consumer confusion as to source or sponsorship. *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130 (1947); *Societe Comptoir, supra*, 299 F.2d at 36. Absolute prohibitions of speech as provided for in the instant preliminary injunction are improper where there is any possibility that an explanation or disclaimer will suffice. *In re R.M.J.*, 455 U.S. 191, 203 (1982). There, in a slightly different context (attorney advertising), the Supreme Court held that the government "may not place an absolute prohibition on certain types of potentially misleading information . . . if the information also may be presented in a way that is not deceptive. . . . [T]he remedy in the first instance is not necessarily a prohibition but preferably a requirement of disclaimers or explanation." *Id.*

A factual pattern similar to the instant case was presented to the court in *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors*, 681 F.2d 397 (5 Cir.1982). There a weight-loss clinic advertised that a BBB "spy" had concluded that the program "really works". Like CU, the Better Business Bureau's reputation depends on the public's perception that it is totally independent from industry. It promptly commenced an action to enjoin further mention of its name in advertisements. Even though the court agreed that the ad was misleading, it held that the injunction forbidding all use of the words "Better Business Bureau" in appellant's advertising violated the First Amendment.

The court modified the injunction to forbid only language suggesting that the BBB had endorsed the clinic and to require a disclaimer to that effect.

The district court in the instant case erred in enjoining Regina from making any reference to the favorable CONSUMER REPORTS rating. If the record truly evinced a likelihood of consumer confusion (which it does not), the proper course would have been to require a clear disclaimer. The First Amendment demands use of a disclaimer where there is a reasonable possibility that it will suffice to alleviate consumer confusion.

Turning to Regina's disclaimer in the instant case, of course an inadequate disclaimer would be no defense, *Dallas Cowboys Cheerleaders, supra*, 604 F.2d at 205. Here there was no evidence that the disclaimer was inadequate. The court in *Better Business Bureau, supra*, 681 F.2d at 406, found that a similar disclaimer was sufficient to protect the Better Business Bureau's interests in maintaining its reputation for impartiality. Presumably the disclaimer printed in each issue of CU's magazine dissuades the readers of CONSUMER REPORTS from concluding that CU is affiliated with the companies whose products it reviews. In view of its faith in the efficacy of its own disclaimer, CU's position that *no* disclaimer by Regina would be sufficient to prevent consumer confusion does not ring true. In any event, its extreme position is not supported by the evidence.

We hold that § 43(a) of the Lanham Act and the corresponding claims under state law [12] provide no support for the preliminary injunction.[13]

**12.** CU argues that §§ 349 and 350 of the New York General Business Law provide an appropriate ground on which to base injunctive relief. For the reasons stated above, we hold that Regina's ads have not been shown to be "misleading in a material respect".

**13.** Our conclusion that CU has not presented a serious question on the merits of the Lanham Act claim warranting injunctive relief is consistent with the judgments of courts in prior cases that CU's trademark claims were too

doubtful to warrant injunctive relief, even where the advertising involved was deceptive and presented a far greater potential for confusion than does Regina's. *See Amana Refrigeration, Inc. v. Consumers Union of United States, Inc.*, 431 F.Supp. 324 (N.D.Iowa 1977) (brochure quoted favorable 1968 CONSUMER REPORTS rating and ignored unfavorable 1973 CONSUMER REPORTS article); *Consumers Union of United States, Inc. v. Theodore Hamm Brewing Co.*, 314 F.Supp. 697 (D.Conn.1970) (advertising

### C.

This brings us to CU's privacy claims.

■ Section 397 of the New York General Business Law prohibits use of the name of a non-profit corporation for advertising purposes without first obtaining written consent.[14] We do not believe that the legislature intended that § 397 should apply to a situation where the non-profit corporation's business is that of evaluating products and where it widely disseminates the results. Not only does CONSUMER REPORTS favorably assess the Regina Powerteam,[15] but it attempts to spread this assessment through newspapers and radio announcements. The purpose of § 397 and similar state statutes is to protect the right to privacy. By going public with its views, CU places itself in a position where its privacy is not infringed when these views are repeated.

Absent state decisional law to the contrary, we hold that § 397 is not intended to bar the use of the name of a non-profit corporation where it injects itself into the commercial world by publicly evaluating commercial products.

### D.

Since CU has failed to establish a likelihood of success on the merits, there remains to be determined whether it has shown sufficiently serious questions going to the merits to make them a fair ground for litigation and whether there is a balance of hardships tipping decidedly in its favor.

In balancing the hardship to CU stemming from continued telecast of the commercials with the hardship to Regina attendant on maintenance of the injunction, we hold that CU has not sustained its burden of showing that the equities lie in its favor. The only evidence introduced by CU on the issue of hardship is the affidavit of Rhoda Karpatkin, Executive Director of CU, which states: "[e]ach broadcast hurts Consumers Union deeply. Each broadcast destroys more and more of the untainted reputation for impartiality and freedom from commercial bias which we have painstakingly spent forty-seven years in acquiring." [16]

It is undeniable that CU has built an impressive reputation for independence from industry and that this reputation may be critical to the success of CONSUMER REPORTS. Nevertheless, too great an inferential leap is required to go from acknowledgement of this reputation to the conclusion that Regina's use, *accompanied by the disclaimer,* will injure CU's reputation significantly. Regina's use of an explicit disclaimer makes CU's conclusory claims of harm unacceptable. *Stop the Olympic Prison v. United States Olympic Committee,* 489 F.Supp. 1112, 1123 (S.D.N.Y.1980). Much like the court presented with a poster of a pregnant Girl Scout captioned "Be Prepared", we doubt that CU's reputation

claimed CU rated Hamm's beer "first" among "beers Americans like best" when only certain beers were tested and Coors received a rating equal to Hamm's).

14. N.Y.Gen.Bus.Law § 397 in relevant part provides:

"1. No person, firm, association or corporation shall use, for advertising purposes or for purposes of trade, the name, symbol, device or other identification of any non-profit corporation, association, society or organization organized exclusively for religious, benevolent, humane, charitable, educational ... purposes ... without having first obtained the written consent of such non-profit corporation, association, society or organization. Any violation of this section shall be a misdemeanor.

\* \* \*

3. Whenever there shall be an actual or threatened violation of subdivision one of this section, the corporation, association, society or organization affected thereby may maintain an equitable action in the supreme court of this state to prevent and restrain said actual or threatened violation ...."

15. The magazine would have a very small circulation if consumers bought it only out of intellectual curiosity and not to rely upon it in selecting their purchases.

16. This reputation nevertheless appears to have grown despite past uses of CU's name which it has not succeeded in enjoining. *Consumers Union of United States, Inc. v. Theodore Hamm Brewing Co., supra* note 13, 314 F.Supp. at 701; *Consumers Union of United States, Inc. v. Hobart Manufacturing Co.,* 189 F.Supp. 275 (S.D.N.Y.1960).

faces imminent collapse. *Girl Scouts of the United States of America v. Personality Posters Mfg. Co.*, 304 F.Supp. 1228 (S.D.N.Y. 1969).

Balanced against the lack of concrete evidence of harm to CU, there is substantial evidence of potential harm to Regina from maintenance of the injunction. The further removed Regina's ads become from the date of CU's publication, the less significant an impact the advertising will have on the market. *Consumers Union of United States, Inc. v. Theodore Hamm Brewing Co., supra* note 13, 314 F.Supp. at 701. The highly competitive nature of the lightweight vacuum cleaner market makes effective pre-Christmas advertising essential to Regina.

We conclude that CU has failed to establish a likelihood of success on the merits and has failed to establish that the equities clearly favor CU. Accordingly, we confirm our order entered November 25, 1983 reversing the order of the district court, vacating the preliminary injunction, and directing that the mandate issue forthwith.

Costs to appellants.

Reversed and vacated.