**HUSTLER MAGAZINE, INC.,**
Plaintiff-Appellant,

v.

**MORAL MAJORITY, INC., a District of Columbia Corporation; Old Time Gospel Hour, a Virginia Corporation and Jerry Falwell, an individual, Defendants-Appellees.**

No. 85–5904.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 6, 1986.

Decided Aug. 12, 1986.

David O. Carson, Cooper, Epstein, & Hurewitz, Beverly Hills, Cal., for plaintiff-appellant.

Jewel Bjork, Grutman, Miller, Greenspoon, Handler & Levin, New York City, for defendants-appellees.

Before PREGERSON and POOLE, Circuit Judges, and SOLOMON,* Senior District Judge.

PREGERSON, Circuit Judge.

Hustler Magazine, Inc. published a parody featuring Reverend Jerry Falwell. Moral Majority, Inc. and Old Time Gospel Hour mailed hundreds of thousands of copies of the parody as part of a solicitation drive. Falwell also solicited contributions while displaying the parody on the Old Time Gospel Hour, a television show. Hustler Magazine, Inc. sued Moral Majority, Inc., Old Time Gospel Hour, and Falwell for copyright infringement. The district court granted the defendants' summary judgment motion, holding that their copying constituted "fair use," 606 F.Supp. 1526. Hustler appeals and both sides request costs and attorney fees. We affirm.

## BACKGROUND

In the November 1983 and March 1984 issues of Hustler Magazine, appellant Hustler Magazine, Inc. ("Hustler") published a parody of Campari liquor advertisements. Campari advertisements consist of interviews with famous people about the first time they drank Campari. The advertisements use double entendres to give the reader the impression that the "first time"

* The Honorable Gus J. Solomon, Senior District Judge, District of Oregon, sitting by designation.

refers to the celebrity's first sexual experience.

The Hustler Magazine parody featured Reverend Jerry Falwell, a nationally known fundamentalist minister, describing his "first time" as being incest with his mother in an outhouse, and saying that he always gets "sloshed" before giving his sermons. At the bottom of the page in small print is the disclaimer "AD PARODY—NOT TO BE TAKEN SERIOUSLY."

On November 15, 1983, Moral Majority, Inc., a conservative political lobbying group, sent out two mailings signed by Falwell. One was directed to approximately 500,000 "rank-and-file" members. It described the parody without including a copy of the actual parody, and asked for a contribution to help Falwell "defend his mother's memory" in court.[1] This first mailing is not involved in the suit. The second mailing was directed to about 26,900 "major donors" and included a copy of the parody with eight of the most offensive words blackened out. It also requested donations to help finance Falwell's suit against Hustler.

Three days later, Old Time Gospel Hour, a corporate sponsor of religious television and radio broadcasts, mailed a solicitation including a copy of the parody to approximately 750,000 supporters of its programs. This letter was also signed by Falwell, but focused on the need to keep Falwell's religious television stations open in order to combat people like Larry Flynt, Hustler's publisher. Within 30 days of the mailings, the Moral Majority received approximately $45,000 from the "major donors" letter and the Old Time Gospel Hour received approximately $672,000 from its letter. A Moral Majority executive admitted that the intent behind including copies of the parody was to raise money.

Finally, on December 4, 1983 and December 11, 1983, Falwell displayed the parody during nation-wide television broadcasts of his weekly sermon on the Old Time Gospel Hour. The amount of contributions generated from this broadcast is not in the record.

On August 8, 1984, Hustler sued Moral Majority, Inc., Jerry Falwell, and the Old Time Gospel Hour (the "Defendants") for infringing its copyright. In March 1985, the parties filed cross motions for summary judgment. The Defendants raised the defense of fair use.[2] The district court held that Hustler had made out a prima facie case of infringement, but granted summary judgment for the Defendants. The court held that the mailings and television displays were permissible under the fair use doctrine.

Hustler timely appealed and this court has jurisdiction.

## STANDARD OF REVIEW

"The task of this court is identical to that of the trial court when reviewing a grant of summary judgment." *Continental Casualty Co. v. City of Richmond*, 763 F.2d 1076, 1078 (9th Cir.1985). Accordingly, we determine *de novo* whether, viewing the evidence in the light most favorable to the party against whom summary judgment has been granted, the moving party has demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 1079; Fed.R.Civ.P. 56(c).

■ "Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985); *accord Pacific and Southern Co. v. Dun-*

---

1. In an action separate from the instant case, Falwell sued Hustler, Inc., its publisher Larry Flynt, and Flynt Distributing Company in state court in Virginia for libel, invasion of privacy, and the intentional infliction of emotional distress. The jury held for Falwell only on the emotional distress claim. Hustler is appealing the verdict.

2. The Defendants apparently also raised the equitable defense of unclean hands at the summary judgment hearing and argued that Hustler did not own a valid or enforceable copyright in the parody. The district court did not reach this question, and the Defendants do not raise it on appeal.

*can,* 744 F.2d 1490, 1495 n. 8 (11th Cir. 1984), *cert. denied,* — U.S. —, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985).[3] If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work. *See Diamond v. Am-Law Publishing Corp.,* 745 F.2d 142, 147 (2d Cir.1984).

## DISCUSSION

### I. *Fair Use*

"[T]here are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." 3 M. Nimmer, *Nimmer on Copyright* § 13.01 (1985). In the instant case, there is no dispute that Hustler is the registered owner of the copyrighted parody. Hustler, as the copyright owner, has the exclusive right to reproduce, distribute, and publicly display copies of the work. *See* 17 U.S.C. § 106. Falwell copied the parody without Hustler's permission. Thus, the district court properly found that Hustler made out a *prima facie* case of infringement. *See Walker v. University Books, Inc.,* 602 F.2d 859, 862 (9th Cir.1979).

Hustler's exclusive rights, however, are subject to statutory exceptions, including the exception for "fair use." *See* 17 U.S.C. §§ 106, 107. Accordingly, Defendants seek to avoid liability by establishing the defense of "fair use." The fair use doctrine confers a privilege on people other than the copyright owner "to use the copy-righted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner." *Marcus v. Rowley,* 695 F.2d 1171, 1174 (9th Cir. 1983) (quoting *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967)). The doctrine is a means of balancing the need to provide individuals with sufficient incentives to create public works with the public's interest in the dissemination of information. *See Pacific and Southern Co.,* 744 F.2d at 1495. Congress incorporated this common law doctrine into section 107 of the Copyright Act of 1976, 17 U.S.C. §§ 101–810.

Section 107 reads in pertinent part: "Notwithstanding the provisions of section 106, the fair use of a copyrighted work ... for purposes such as criticism, comment, [or] news reporting, ... is not an infringement of copyright." 17 U.S.C. § 107.

In addition, section 107 specifies four factors this court must consider in determining whether the use in a particular case is a fair use:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.[4] Courts balance these factors to determine whether the public

---

**3.** *But see DC Comics, Inc. v. Reel Fantasy, Inc.,* 696 F.2d 24, 28 (2d Cir.1982) (fair use is normally a question of fact); *MCA, Inc. v. Wilson,* 677 F.2d 180, 183 (2d Cir.1981); *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.,* 626 F.2d 1171, 1175 (5th Cir.1980); *Eisenschiml v. Fawcett Publications, Inc.,* 246 F.2d 598, 604 (7th Cir.), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); 3 M. Nimmer, *Nimmer on Copyright* § 13.05 at 13–63 (1985).

**4.** The legislative history is clear, however, that these factors are not exclusive. The Report of the Committee on the Judiciary of the House states:

Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts.... Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be

interest in the free flow of information outweighs the copyright holder's interest in exclusive control over the work. *See DC Comics, Inc. v. Reel Fantasy, Inc.,* 696 F.2d 24, 27 (2d Cir.1982).

### A. *The Purpose and Character of the Defendants' Uses*

■ The first factor listed in section 107 requires us to consider the character of the use and to weigh the commercial or non-profit purpose of the use. If the work is used for a commercial or profit-making purpose, the use is presumptively unfair. *See Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 449–451, 104 S.Ct. 774, 792–793, 78 L.Ed.2d 574 (1984). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 2231–32, 85 L.Ed.2d 588 (1985); *see also Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.,* 621 F.2d 57, 61 (2d Cir.1980) ("The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance.").

The parties disagree about the purpose and character of the use. Falwell contends that he sent the parody to his followers to give them information to rebut the statements it contained, and that the appeal for money was ancillary. Hustler contends, however, that the advertisement was clearly a parody so there was nothing to rebut and thus the letters were purely fundraisers.

There is ample evidence that the defendants distributed copies of the parody as an integral part of a financial appeal. All of the letters and television displays involved outright appeals for donations to the Moral Majority to support Falwell's lawsuit against Hustler[5] or to the Old Time Gospel Hour to support his radio and television network.[6]

Moreover, the chief executive officers of Moral Majority and Old Time Gospel Hour admitted that the parody was copied and sent as part of a "market approach" to fundraising. Falwell's displaying of the parodies on his television show was also motivated by financial purposes. In addition, the Defendants raised almost one million dollars and therefore clearly profited from their use of the parody without paying any price. Because the Defendants used the parody for a profit-making purpose, their use is presumptively unfair.

■ Even assuming that the use had a purely commercial purpose, the presumption of unfairness can be rebutted by the characteristics of the use. *See Triangle*

---

free to adapt the doctrine to particular situations on a case-by-case basis.
H.R.Rep. No. 94–1476, 94th Cong., 2nd Sess. 65–66 *reprinted in* 1976 U.S.Code Cong. & Ad. News 5659, 5679–80 [hereinafter cited as "House Report"].

**5.** For example, the November 15, 1983 appeal to Moral Majority "major donors" reads in part:

As you know, legal matters are time consuming and expensive. There are lawyer's fees and court costs to consider, not to mention the personal time and energy I must devote in these next trying weeks and months.

.     .     .     .     .

Will you help me defend my family and myself against the smears and slander of this major pornographic magazine—will you send a gift of $500 so that we may take up this important legal-battle?

**6.** Old Time Gospel Hour letter dated November 18, 1983 reads in part:

I was ready to cut another 50–100 stations—when someone showed me a full-page liquor advertisement which appeared in the November issue of *Hustler Magazine*—a pornographic tabloid.

When I saw it—I decided that, in a society containing people like Larry Flynt, the Old Time Gospel Hour must remain on the air—on every station.

.     .     .     .     .

I am not a quitter. That is why I have established the Old Time Gospel Hour SURVIVAL FUND.

.     .     .     .     .

[P]lease help me with this SURVIVAL FUND. Your gift of $150 can make a great difference.

*Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1177 (5th Cir. 1980) (comparative advertising); *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir.1983) (advertising information), *cert. denied*, ⸺ U.S. ⸺, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). When the use has both commercial and non-profit characteristics, the court may consider "whether the alleged infringing use was primarily for public benefit or for private commercial gain." *MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir.1981); *see also Meeropol v. Nizer*, 560 F.2d 1061, 1069 (2d Cir.1977) ("[I]t is relevant whether or not the Rosenberg letters were used primarily for scholarly, historical reasons, or predominantly for commercial exploitation."), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978).

In the instant case, Defendants concede that their use was in part to raise money. They contend, however, that they also used the copies to rebut the personal attack upon Falwell and make a political comment about pornography. There was no attempt to palm off the parody as that of the Defendants. In fact, the very opposite is true. Falwell was not selling the parody, but was instead using the parody to make a statement about pornography and Larry Flynt, the publisher of Hustler.[7]

Section 107 expressly permits fair use for the purposes of criticism and comment. 17 U.S.C. § 107. Hustler contends, however, that Falwell copied more than was necessary for his response. Hustler points to the fact that Falwell mailed a similar letter of criticism to Moral Majority "rank and file" members without enclosing a copy of the parody. However, an individual in rebutting a copyrighted work containing derogatory information about himself may copy such parts of the work as are necessary to permit understandable comment.[8] Falwell did not use more than was reasonably necessary to make an understandable comment when he copied the entire parody from the magazine.[9] Therefore, the public interest in allowing an individual to defend himself against such derogatory personal attacks serves to rebut the presumption of unfairness.

**B.** *The Nature of the Copyrighted Work.*

The scope of fair use is greater when "informational" as opposed to more "crea-

---

7. The November 15, 1983 appeal to Moral Majority "major donors" reads in part:

   Sane and moral Americans all across our nation are outraged by how much these pornographers are getting away with these days. And pornography is no longer a thing restricted to back-alley bookshops and sordid movie houses.

   Now pornography has thrust its ugly head into our everyday lives and is multiplying like a filthy plague. Flynt's magazine, for example, advertises pornographic telephone services where, for a fee, men or women will engage in an obscene phone call with you!

   Cable pornography with its "X" rated and triple "X" rated films can bleed over into a regular cable system right into your own living room.

   And there, in my opinion, is clear proof that the billion dollar sex industry, of which Larry Flynt is a self-declared leader, is preying on innocent, impressionable children to feed the lusts of depraved adults.

   For those porno peddlers, it appears that lust and greed have replaced decency and morality.

8. The legislative history to section 107 states:

   When a copyrighted work contains unfair, inaccurate, or derogatory information concerning an individual or institution, the individual or institution may copy and reproduce such parts of the work as are necessary to permit understandable comment on the statements made in the work.

   House Report, *supra* at 73, U.S.Code Cong. & Admin.News 1976, p. 5687.

9. Hustler contends that even if Falwell had a right to copy the parody of himself to rebut its content, Moral Majority and Old Time Gospel do not have the same right. However, all the letters went out under Falwell's name and on Falwell's stationary. Clearly Falwell, as president and founder of both entities, used them as a medium to transmit his messages. For the same reason, Falwell fails in his contention that he should be dismissed from the case because he did not personally receive any money. The letters asked for money for *his* legal costs and to save *his* television stations.

tive" works are involved. *Marcus v. Rowley*, 695 F.2d 1171, 1176 (9th Cir.1983); *see also Harper & Row*, 105 S.Ct. at 2232 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."); *Sony Corp.*, 464 U.S. at 455 n. 40, 104 S.Ct. at 794 n. 40 ("Copying a news broadcast may have a stronger claim to fair use than copying a motion picture."); 3 *Nimmer on Copyright* § 13.05[A][2]. Thus, we consider whether the work is imaginative and original, or whether it represented a substantial investment of time and labor made in anticipation of a financial return. *MCA*, 677 F.2d at 182.

There is no dispute that the parody was more creative than informational. The district court discounted the significance of the work's creative nature, however, because the defendants did not use the parody for its creative value.

■ There is nothing in the statute, case law, or legislative history to support the district court's approach. In fact, by copying all or substantially all of the copyrighted work, "the distinction of function vanishes since whatever the intent of the copier, a verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's." 3 *Nimmer on Copyright* § 13.05[D](1). Accordingly, the creative nature of the parody means that the scope of fair use in this case is less than the scope of fair use for informational works.

### C. The Amount and Substantiality of the Portion Used

In the instant case, the Defendants copied the entire parody, covering up only eight of the most offensive words. Defendants argue that they did not copy an entire work, but only one page from a

154–page magazine.[10] Although each component of a composite work is capable of individual copyright protection and need not bear a separate copyright notice, 17 U.S.C. § 404, *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 301 n. 5 (9th Cir.1965), courts have not always evaluated a component of a copyrighted composite work as an "entire work." Rather courts consider the relationship of the copied component to the composite work to determine whether to analyze the work as an "entire work."

The Fifth Circuit is one of two circuits to have expressly discussed this issue.[11] In *Triangle Publications*, 626 F.2d 1171, the court held that Knight-Ridder had not copied an entire work by reproducing the cover of TV Guide Magazine for comparative advertising purposes. *Id.* at 1177 & n. 15. The court noted that Knight-Ridder did not copy the essence of the magazine—the television schedules and articles. *Id.*

The Eleventh Circuit evaluated this issue in a slightly different context. In *Pacific and Southern Co.*, 744 F.2d 1490, a company videotaped a television station's news broadcasts and sold copies of the relevant portions. The television station sued the company for selling a tape of a story from one of its broadcasts. The court held that the feature, as a coherent narrative, stands alone as a copyrighted work. *Id.* at 1497. Therefore, the company had copied an entire work. The court distinguished the case from *Triangle Publications* because the program segment was copyrighted separately and was stored separately from the rest of the broadcast. *Id.* at 1497 n. 10.

■ Thus to determine whether the parody should be treated as an "entire work," we consider the relationship of the copied parody to the periodical as a whole. Unlike

---

10. The district court also held that even if the parody was an "entire work" it would not give weight to copying the whole because it consisted of only approximately 300 words. There are no cases supporting this view. In fact, even though *Harper & Row* involved a taking of about 300 words, the Supreme Court refused to find fair use. 105 S.Ct. at 2233–34.

11. Without discussing this issue, the Second Circuit compared the amount taken from an article in *Consumer Reports* to the length of the article, not the whole magazine. *Consumers Union*, 724 F.2d at 1050.

the cover of TV Guide in *Triangle Publications,* the inside pages of a magazine are not on public display. Moreover, the parody in this case, like the story in *Pacific and Southern Co.,* represents the "essence" of Hustler Magazine. In addition, like the story in *Pacific and Southern Co.* and unlike the magazine cover in *Triangle Publications,* the parody is not an interwoven component of the magazine, but can stand totally alone. A creative work does not deserve less copyright protection just because it is part of a composite work. Therefore, in this case, we view the Defendants as having copied an entire work.

Hustler argues that "this court has long maintained the view that wholesale copying of copyrighted material precludes application of the fair use doctrine." *Marcus,* 695 F.2d at 1176. *See also Benny v. Loew's, Inc.,* 239 F.2d 532, 536 (9th Cir.1956), *aff'd by an equally divided court sub nom. Columbia Broadcasting System v. Loew's,* 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958); *Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 758 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979).

The Supreme Court's opinion in *Sony Corp.,* 464 U.S. 417, 104 S.Ct. 774, however, casts doubt on our previous pronouncements concerning wholesale copying as an absolute preclusion to fair use. In *Sony Corp.,* the Supreme Court held that "time-shifting" television programs by taping *whole* programs with a video tape recorder did not have its "ordinary effect of militating against a finding of fair use." *Id.* at 450, 104 S.Ct. at 793.

▮ *Sony Corp.* teaches us that the copying of an entire work does not preclude fair use *per se.* However, "a subsequent user does not require such complete copying if he is truly pursuing a different functional mileau." 3 *Nimmer on Copyright* § 13.05[D]. Consequently, although wholesale copying does not preclude fair use *per se,* the amount of copying that the Defendants did in this case still militates against a finding of fair use.

**D.  *Effect Upon Potential Market or Value***

Finally, we must consider "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "This last factor is undoubtedly the single most important element of fair use." *Harper & Row,* 105 S.Ct. at 2234. *See also* 3 Nimmer § 13.05[A] at 13-76. "The purpose of copyright is to create incentives for creative effort." *Sony Corp.,* 464 U.S. at 450, 104 S.Ct. at 793. "[A] use that has no demonstrable effect upon the market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Id.* Therefore, "[f]air use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row,* 105 S.Ct. at 2234 (quoting 1 *Nimmer* § 1.10[D] at 1-87).

▮ In the instant case, the parties disagree over whether the Defendants copied the parody for commercial or noncommercial uses. Every commercial use of copyrighted material is presumptively an unfair exploitation of a copyright owner's monopoly; accordingly, the likelihood of future harm may be presumed. *Sony Corp.,* 464 U.S. at 451, 104 S.Ct. at 793. Whereas, when the use is noncommercial, the copyright owner must demonstrate by a preponderance of the evidence that there is *"some meaningful likelihood of future harm." Id.* (emphasis in the original). The owner, however, need only show that, should the challenged use become widespread, it would adversely affect the potential market for the work. *Id.; Harper & Row,* 105 S.Ct. at 2234-35.

In determining whether the use has harmed the work's value or market, courts have focused on whether the infringing use: (1) "tends to diminish or prejudice the potential sale of [the] work," *Meeropol v. Nizer,* 560 F.2d at 1070; or (2) tends to interfere with the marketability of the work, *Elsmere Music, Inc. v. National Broadcasting Co.,* 482 F.Supp. 741, 747

(S.D.N.Y.), *aff'd,* 623 F.2d 252 (2d Cir.1980); or (3) fulfills the demand for the original work, *Wainwright Securities Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 96 (2d Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *Berlin v. E.C. Publications, Inc.,* 329 F.2d 541, 545 (2d Cir.), *cert. denied,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964).

The parody was first published September 27 and was off the newsstands before the defendants' first mailings in November. Thus, the republication did not diminish the initial sales. We agree with the district court that the effect on the marketability of back issues of the entire magazine is *de minimis* because it is only one page of a publication which would be purchased for "its other attractions."

Nor have the Defendants' mailings effected any potential market, even though the parody could be licensed independently of the magazine.[12] Although the Defendants used the parody for a commercial purpose in the sense that they profited from copying it, they did not actually sell the copies to willing buyers. Instead the Defendants used the copies to generate moral outrage against their "enemies" and thus stimulate monetary support for their political cause. Moreover, as the district court noted, Moral Majority or Old Time Gospel Hour members would probably not be counted among Hustler's readers. Therefore, Hustler's creative incentives are not decreased because the Defendants are profiting from an activity that Hustler could not have taken advantage of. *See Pacific and Southern Co.,* 744 F.2d at 1496. "Where the copy does not compete in any way with the original ... concern [about copiers undercutting demand and discouraging creativity] is absent." *Consumers Union,* 724 F.2d at 1051.

The Defendants' use could not have diminished any potential sales, interfered with the marketability of the parody or fulfilled the demand for the original work.

Therefore, even viewing the Defendants' copying as a commercial use, Defendants have rebutted any presumption of unfair exploitation of Hustler's copyright monopoly.

### E. Conclusion

The fair use doctrine is an equitable rule of reason. *See* House Report, *supra* at 73, U.S.Code Cong. & Admin.News 1976, p. 5686. Weighing all four factors, we find that even after resolving all factual issues in favor of Hustler, the district court did not err in determining that the Defendants' use constituted fair use and granting summary judgment.

## II. Attorneys' Fees

### A. For Defendants

 The Defendants contend that Hustler's appeal is frivolous and request costs and attorneys' fees pursuant to 17 U.S.C. § 505, 28 U.S.C. § 1912 and Fed.R.App.P. 38. Section 505 of Title 17 provides that courts *may* award reasonable costs and attorneys' fees to the prevailing party in an infringement action. 17 U.S.C. § 505 (emphasis added). Thus, this court may make an award for services rendered on appeal. *See Russell v. Price,* 612 F.2d 1123, 1132 (9th Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980). An award of attorneys' fees to the defendant represents "a penalty for the institution of a frivolous or bad faith suit." *Jartech, Inc. v. Clancy,* 666 F.2d 403, 407 (9th Cir.), *cert. denied,* 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982). An appeal is frivolous if the result is obvious or the arguments presented are wholly without merit. *NLRB v. Catalina Yachts,* 679 F.2d 180, 182 (9th Cir.1982).

Hustler's arguments, however, are not "ludicrous" as the Defendants find them, nor is there evidence to support their contention that Hustler brought the appeal merely as a means of further harassment.

---

12. The fact that Hustler does not actively market the parody for other purposes is irrelevant because Section 107 looks to the "potential market" in analyzing the effects of the alleged infringement. *See Pacific and Southern Co.,* 744 F.2d at 1496.

In fact, there is some merit to Hustler's appeal. Accordingly, we deny the Defendants' request for attorneys' fees and costs.

### B. *For Hustler*

Hustler also seeks an award of costs and attorneys' fees pursuant to 17 U.S.C. § 505. "Section 505 is intended in part to encourage the assertion of colorable copyright claims and to deter infringement." *Diamond v. Am-Law Publishing Corp.*, 745 F.2d 142, 148 (2d Cir.1984). Defendants, however, should not be penalized for defending an appeal. Therefore, we deny Hustler's request for attorneys' fees on appeal.

AFFIRMED.

POOLE, dissenting:

The majority concedes that Moral Majority, Inc., Old Time Gospel Hour, and Jerry Falwell distributed or displayed Hustler Magazine's copyrighted ad parody in an effort to raise money for themselves. Despite this commercial purpose, the majority concludes that their copying constituted "fair use." I disagree.

Section 107 of the Copyright Act of 1976 specifies four factors this court must consider in analyzing the merits of a fair use defense:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The proposed opinion analyzes these factors and concludes that the first and fourth factors support a finding of fair use while the second and third factors militate against such a finding. The opinion then summarily concludes "[w]eighing all four factors, we find that even after resolving all factual issues in favor of Hustler, the district court did not err in determining that the Defendants' use constituted fair use and granting summary judgment." Opinion at 1156. Since the key to this conclusion lies with factors one and four, I will focus on the majority's analysis of those two factors.

### A. *The First Factor: the Purpose and Character of the Defendants' Use*

The opinion acknowledges that the parody was distributed by the defendants as an integral part of a financial appeal. Thus, the use is presumptively unfair. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 449, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984). The defendants attempt to rebut this presumption by claiming that their primary reason for sending the copies was to refute the personal attack upon Falwell and to make a political comment about pornography.

Assuming that the defendants were also motivated by such purposes, their actions in publishing the entire parody went beyond the limited boundaries of the fair use defense. As conceded by the majority, the defendants could copy only so much of the work as was necessary to permit understandable comment. There is no reason why Falwell needed to copy the entire parody to rebut the personal attack or to comment on what the "pornographers" were publishing. A summary of the parody, such as that contained in the factual summary of the majority opinion, would have sufficed. Quite clearly, the only reason for copying the entire parody would be to increase the chances that the parody would arouse such moral indignation that the members would be more likely to send in financial contributions to help support Falwell's lawsuit against Hustler or to support his radio and television network. Accordingly, the majority's conclusion that Falwell did not copy more of the parody than was reasonably necessary to make an understandable comment confuses Falwell's true purpose in copying the entire work.

Moreover, I disagree with the legal conclusion by the majority that "the public interest in allowing an individual to defend

himself against * * * derogatory personal attacks serves to rebut the presumption of unfairness." Opinion at 1153. Such a sweeping generalization finds no support in either the case law or the purposes underlying the fair use defense. On the contrary, it is clear that the public's interest in reading an author's work is not alone sufficient to override the protections granted under the federal copyright laws. In *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), the Court held that a magazine's act of publishing verbatim excerpts from the unpublished memoirs of former President Gerald R. Ford did not constitute fair use. The Court rejected the magazine's contention that the newsworthiness of the contents of the manuscript independently justified its unauthorized copying of the expression prior to publication by the copyright holder. *Id.* 105 S.Ct. at 2229; *see Iowa State University Research Foundation, Inc. v. American Broadcasting Cos., Inc.*, 621 F.2d 57, 61 (2d Cir.1980) ("The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance."). It is not a license for assertedly religious or "moral" theft, either. Accordingly, Falwell's alleged purpose of defending himself against the personal attack made by Hustler in its ad parody, if that were indeed his purpose, might certainly constitute some factor in the fair use analysis, but it does not excuse the infringement of Hustler's copyright. Falwell's claim, however, is belied by the manifestly financial gain which he hastened to secure.

As previously noted, Falwell went beyond simply criticizing and commenting on the ad parody and actively sought to exploit the emotional impact of the work to raise money. This commercial use of the copyrighted work is a separate factor that weighs against a finding of fair use. The fact that Falwell also had other motives in publishing the parody does not prevent the operation of this factor for "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 105 S.Ct. at 2231–32. The defendants published Hustler's parody in the hope of milking the possible indignation it would arouse for their own personal monetary benefit. This purpose weighs strongly against a conclusion that the defendants' use of the parody was a fair use.

### B. The Fourth Factor: Effect Upon Potential Market or Value

The majority also incorrectly analyzes the fourth factor listed in section 107—the effect upon plaintiff's potential market. This factor is concerned with whether if the challenged use "should become widespread, it would adversely affect the potential market for the copyrighted work." *Sony Corp.*, 464 U.S. at 451, 104 S.Ct. at 793.

If Falwell's actions were to become widespread such that individuals were sending out copies of the ad parody to the public in order to solicit money to support campaigns against "the pornographers" such as Larry Flynt, then quite clearly the future potential market for the parody would be diminished.[1] This is because the act of

---

1. I have problems with the district court's conclusion, accepted by the majority opinion, that Moral Majority or Old Time Gospel Hour members would probably not be counted among Hustler's readers. If such a showing was made or Hustler stipulated to this fact, then such a conclusion can be accepted. Otherwise, I do not think a court can take judicial notice of such a matter. Furthermore, Hustler's future licensing rights with regard to the parody may be impaired nonetheless since these Moral Ma-

jority or Old Time Gospel Hour members may count themselves readers of a different publication which could contain this parody, e.g., a compilation of parodies of public figures which contains this parody, albeit probably a toned down version. Or the members, if they had not already seen the entire parody, may have become curious enough about its contents as to break down and purchase the back copy of Hustler magazine or a future copy wherein the magazine had republished the parody. Or, per-

distributing copies of the entire copyrighted work to the public would fulfill the demand of the original. *See Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 96 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). "Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented." *Harper & Row*, 105 S.Ct. at 2235 (quoting S.Rep. No. 94–473, p. 65 (1975)).

Under what I believe to be the only sensible analysis, all four factors weigh against a finding of fair use. Consequently, I would reverse the district court's decision and remand the case with directions that it enter summary judgment in favor of Hustler.

haps the fact that the parody was included in that back copy might tempt some persons to use that fact as a justification for looking into the other contents of the magazine—in order to comprehend how shocking was the setting in which the parody appeared.