**CONSUMERS UNION OF UNITED STATES, INC., Plaintiff,**

v.

**The NEW REGINA CORPORATION and Grey Advertising, Inc., Defendants.**

No. 83 Civ. 7209(RJW).

United States District Court, S.D. New York.

June 23, 1987.

---

Esanu, Katsky, Korins & Siger, New York City, for plaintiff; Michael N. Pollet, Thomas M. Lopez, Thomas M. Slahta, of counsel.

Cooper, Dunham, Clark, Griffin & Moran, New York City, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., for defendant The New Regina Corp.; Jules P. Kirsch, Peter D. Murray, New York City, and Charles D. Ferris, Bruce D. Sokler, Cameron F. Kerry, Washington, D.C., of counsel.

Davis & Gilbert, New York City, for defendant Grey Advertising; Howard J. Rubin, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiff Consumers Union of the United States, Inc. ("CU") originally filed this action against defendants the New Regina Corporation ("Regina") and Grey Advertising Inc. ("Grey") seeking injunctive relief and compensatory and punitive damages arising out of the broadcast of television commercials which quoted verbatim from a copyrighted article published in its periodical Consumer Reports. CU alleges that defendants' quotation of its evaluations and attribution of the evaluations to CU violated its federal copyright and trademark rights and constituted as well false and misleading advertising and unlawful use of its name under New York State law. Defendants now move for summary judgment under Rule 56, Fed.R.Civ.P., or, in the alternative, for an order restraining plaintiff from introducing consumer research surveys that have been conducted on its behalf. For the reasons to follow, the Court denies both motions.

## BACKGROUND

### A. Factual Background.

CU is a New York not-for-profit corporation organized in 1936. CU's primary purpose is independently to test consumer products and to publish the test results and evaluations in its monthly magazine Consumer Reports. Circulation of Consumer Reports exceeds three million copies per month. CU copyrights each issue of Consumer Reports.[1]

CU alleges that it has gained a reputation over the past fifty years for impartial and objective testing of and reporting on consumer products. To foster and maintain its reputation for objectivity, CU follows a non-commercialization policy. Un-

---

1. Consumers Union owns the registered trademark Consumer Reports, United States Patent Office No. 672,849. Notice of the mark's registration appears on the inside front cover of each issue of Consumer Reports.

 Consumer Reports (ISSN 0010–7174) is published monthly by Consumers Union of United States, Inc., 256 Washington St., Mount Vernon, N.Y. 10550. Canadian postage paid at Niagara Falls, Ontario, Canada. Title CONSUMER REPORTS registered in U.S. Patent Office. Contents of this issue copyright © 1983 by Consumers Union of United States, Inc. All rights reserved under international and Pan-American copyright conventions.

 Permissions and reprints: Reproduction of CONSUMER REPORTS in whole or in part is forbidden without prior written permission (and is never permitted for commercial purposes). Requests for permission should be addressed to: Permissions, Consumers Union, 256 Washington St., Mount Vernon, N.Y. 10550....

der that policy the organization accepts no outside advertising in any of its publications and has steadfastly refused to grant permission to others to use its name or copyrighted materials in advertisements.[2] CU contends that this arms-length relationship with manufacturers distinguishes it from other testing organizations and publishers which provide consumer advice. CU further asserts that were manufacturers routinely permitted to utilize its published evaluations and to associate its name with their products in advertising campaigns, the public would lose confidence in CU's neutrality.

The July 1983 issue of Consumer Reports contained an article that evaluated and compared eighteen different models of lightweight vacuum cleaners. Defendant Regina manufactured four of the models tested. The article judged Regina's Elictrikbroom Powerteam HB 6910 ("Powerteam 6910") to be the best of all models tested. CU check-rated the model, signifying that the model was of high quality and appreciably superior to the other models that had not been check-rated. CU rated the three other Regina models from fair to poor.

On June 28, 1983, counsel for Regina requested permission from Consumers Union to quote the favorable evaluation of the Powerteam 6910 in an advertising campaign. Through counsel, CU denied permission. Sometime between July and September, 1983, Regina hired Grey Advertising to create a series of television commercials for the Powerteam 6910. Two of the commercials were eventually broadcast on network television. On September 27, 1983, Regina notified Consumers Union that it had begun airing the television commercials which quoted verbatim from the evaluation of the Powerteam 6910.[3] The first commercial, entitled "Squid," featured a voice over announcer who states that the Powerteam 6910 is "the only lightweight that Consumer Reports says was an adequate substitute for a full size vacuum." While the announcer is speaking, a disclaimer appears on the screen noting that "Consumer Reports is not affiliated with Regina and does not endorse products." The second commercial, entitled "Consumer Reports," includes several verbatim quotations from the evaluation of the Powerteam 6910. These quotations flash on the screen as the announcer reads them. Each time the announcer mentions Consumer Reports, the same disclaimer used in Squid appears on the screen.

After viewing the commercials, CU demanded that Regina withdraw them immediately. Regina refused. The company did, however, alter the disclaimer to read that "Consumer Reports is not affiliated with Regina and does not endorse Regina products or any other products."

### B. Procedural Background.

CU then filed suit, alleging three causes of action. First, CU contends that New Regina's unauthorized verbatim quotation from Consumer Reports infringed its copyright. *See* 17 U.S.C. § 101 *et seq.* Second,

---

**2.** Since 1936 each issue of Consumer Reports has stated in substance:

> Consumers Union accepts no advertising or product samples and is not beholden in any way to any commercial interest. Its Ratings and product reports are solely for the use of readers of CONSUMER REPORTS. Neither the Ratings nor the reports may be used in advertising or for any commercial purpose. CU will take all steps open to it to prevent such uses of its material, its name, or the name of CONSUMER REPORTS.

Plaintiff's Memorandum In Opposition To Defendants' Motion For Summary Judgment at 4 ("Plaintiff's Memorandum").

**3.** The "Consumer Reports" commercial utilized the following verbatim quotations.

And Consumer Reports states, "Regina Powerteam—far ahead of the pack in cleaning ability."
Of all the lightweights tested "only one worked well."
On medium pile carpeting Powerteam "did the job with the least effort."
In fact, it's the only one Consumer Reports calls an "adequate substitute for a full-sized vacuum."
The "Squid" commercial contained the following verbatim excerpt.
It's the only lightweight that Consumer Reports says, quote, "was an adequate substitute for a full-sized vacuum."

CU alleges that New Regina's use of the copyrighted material was intended to confuse and deceive the public in violation of the Lanham Act. *See* 15 U.S.C. §§ 1114(1), 1125. Finally, CU argues that defendants violated New York State statutes concerning deceptive business practices, false advertising, and the unauthorized use of the name of a not-for-profit organization. *See* N.Y.Gen.Bus.Law §§ 349, 350, 350–a, 368–d, 397.

By order to show cause, CU sought to prevent defendants from continuing to air the commercials. On October 3, 1983, Judge Henry Werker granted CU a temporary restraining order preventing Regina from airing the commercials. After hearing argument, but without taking testimony, he issued a preliminary injunction October 14, 1983 on the ground that Regina had violated CU's copyright. In entering the injunction, the district court rejected defendants' fair use and First Amendment defenses and held that CU need not make a detailed showing of irreparable injury once it had established the elements of copyright infringement.

The Second Circuit vacated the preliminary injunction. *Consumers Union of United States, Inc. v. General Signal Corp.* 724 F.2d 1044 (2d Cir.1983), *reh'g. and reh'g. en banc denied,* 730 F.2d 47 (2d Cir.1984) (Oakes, J. dissenting), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). Specifically, the circuit panel held that CU had failed to establish the likelihood of success on the merits of any of its claims. *Id.* at 1051. Because defendants rely heavily on that decision in support of the present motion for summary judgment, for convenience the Court will briefly summarize relevant aspects of it here.

The panel first examined CU's claimed likelihood of success on the merits of the copyright claim. Although defendants had challenged whether CU could copyright the factual references they had made use of in the commercials, the court proceeded immediately to evaluate defendants' assertion of a fair use defense to the alleged copyright infringement.[4] On the first factor, the panel noted the undoubtedly commercial use defendants had made of CU's material, but held that that fact alone did not defeat a fair use defense. "Regardless of motive, the 'character' of Regina's ads includes the conveyance to consumers of useful information which is protected by the First Amendment." 724 F.2d at 1049. In examining the second factor, the court stated that since the nature of Consumer Reports is primarily informational rather than creative, and because the "risk of restraining the free flow of information is more significant with information work, the scope of permissible fair use is greater," and concluded that defendants had used CU's own words in its favorable evaluation in the interests of accuracy not piracy.[5] On the third point, the court concluded that both commercials had made relatively insubstantial use of CU's work. On the fourth factor, the effect of the use upon the potential market for or value of the copyrighted work, the panel expressly rejected Judge Werker's analysis that Regina's commercial use of the Consumer Reports evaluation would cause consumers to lose confidence in CU and would signal the organization's eventual demise.

---

**4.** When Congress codified the judicially created fair use defense in 1976, it intended to restate the present judicial doctrine of fair use, not to change, narrow or enlarge it in any way. 3 M. Nimmer, *Nimmer on Copyright* ¶ 13.05 at 13–62 ("Nimmer"). The codification did not define fair use but rather listed four non-exclusive factors to be considered in determining whether the use made of a work in any particular case is a fair use. The four factors are:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes;

(2) The nature of the copyrighted work;
(3) The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) The effect of the use upon the potential market for or value of the copyrighted work.
17 U.S.C. § 107 (1982).

**5.** On this point, the panel relied on *Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195 (2d Cir.1983), *rev'd* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

We believe that this conclusion is based on a faulty premise. The Copyright Act was not designed to prevent such indirect negative effects of copying. The fourth factor is aimed at the copier who attempts to usurp the demand for the original work. The copyright laws are intended to prevent copiers from taking the owner's intellectual property, and are not aimed at recompensing damages which may flow indirectly from copying.

\* \* \* \* \* \*

Not only are we faced with a claim of injury which does not stem from competition between the copyright owner and the copier, but the owner does not even allege injury to any work currently copyrighted. Rather, it is the value of possible *future* issues of Consumer Reports which CU seeks to protect. This clearly does not involve the fourth factor which focuses upon the effect of the use upon the potential market for or value of *the copyrighted work.*

*Id.* at 1050–51 (citations omitted, emphasis in the original). On the basis of its analysis of the four fair use factors, the panel concluded that CU had not established its likelihood of success on the merits to justify the injunction.

Although Judge Werker had relied solely on CU's copyright claim, the panel next considered whether either the Lanham Act or CU's state law claims of false advertising might justify injunctive relief. While explicitly recognizing that the Lanham Act or corresponding state law claims might be an appropriate form of relief when the quotation of copyrighted evaluations could produce an untoward effect in markets other than that for the original work,[6] the panel nevertheless concluded that CU had produced no evidence of such harm and concluded that neither set of claims would support the preliminary injunction.

On this record Regina's ads have not been shown to give rise to reasonable likelihood of confusion regarding source or sponsorship. The record is devoid of any evidence of actual confusion. The only evidence relating to consumer confusion is the conclusory affidavit of CU's own Executive Director. We are satisfied that the disclaimer is adequate to distance CU and Regina.

*Id.* at 1052. Finally, the panel examined CU's privacy claim under section 397 of the New York General Business Law, concluded that the law did not bar commercial use of a not-for-profit corporation's name in connection with a commercial purpose when that corporation had injected itself into the commercial sphere by publicly evaluating commercial products, and consequently denied preliminary relief on that claim as well.

In the absence of a showing of likelihood of success on the merits, the court turned to consider whether CU had presented serious questions going to the merits and whether CU had demonstrated a balance of hardships tipping decidedly in its favor. In weighing the balance, the panel declined to credit CU's conclusory assertions of harm and therefore reversed the district court and vacated the preliminary injunction. *Id.* at 1055.

### C. The Present Motions.

On the basis of the proceedings and decision in the court of appeals, defendants have moved for summary judgment on all three claims. They contend that the Second Circuit panel made factual findings on each of the four factors relevant to an analysis of a fair use defense to copyright infringement and that the decision is the law of the case. Inasmuch as no factual issues remain to be tried on the copyright claim, they argue, the Court should enter

---

**6.** As the court stated:

 There are alternate forms of relief where copying results in a negative effect which is not an usurpation of plaintiff's original market. The only alleged injury which CU truly presses is that Regina's use may lead to public perception of *endorsement*. Truthful excerpting of CU's ratings cannot hurt CU *unless* the public perceives that CU sponsored the use. In such a case, § 43(a) of the Lanham Act and the privacy statutes which prevent unauthorized product endorsements are more appropriate. CU will have an opportunity to offer proof on this issue at trial and to establish this aspect of its § 43(a) claim if it can.

724 F.2d at 1051 n. 7.

summary judgment in their favor. Plaintiff vigorously disputes whether law of the case applies and, moreover, contends that intervening opinions on fair use by the Supreme Court have elaborated the proper analysis of several fair use factors.

Defendants raise four principal arguments in favor of their motion for summary judgment on the Lanham Act claims. First, they assert that the Lanham Act prohibits only confusion concerning origin or sponsorship and argue that since consumers would not likely think that Regina's products or advertisements originated with CU, no cause of action can be stated. Second, they assert that plaintiff can present no issue that avoids inconsistency with Second Circuit holdings on fair use and the First Amendment. Next, they contend that plaintiff has produced no evidence to establish confusion. Finally, defendants seemingly argue that the Lanham Act does not reach purely informational use of a trademark where that use creates no confusion as to the sponsorship. Plaintiff counters that in its decision the Second Circuit stated no fewer than three times that CU would be permitted to show public perception that it endorsed Regina's product or permitted the use of its mark in conjunction with Regina's advertising.

The Court will consider defendants' motion as to each of plaintiff's causes of action *seriatim*.

## DISCUSSION

### I. Summary Judgment Standards.

General summary judgment principles apply equally to a determination of fair use. A court may grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11

(2d Cir.1986), —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.*, cert. denied, 477 U.S. 242, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)). While the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Insurance Co., supra*, 804 F.2d at 12. The motion then

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

Because the issue of fair use depends on the particular facts of each case and often involves subtle evaluations of numerous mixed issues of fact and law, courts have usually allowed the issue to proceed to trial. *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1258 (2d Cir.1986), cert. denied, —— U.S. ——, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987) (citing cases). Nevertheless, when the parties do not dispute the relevant historical facts underlying each of the factors, courts have not hesitated to grant summary judgment on the basis of the fair use defense. *Id.* (defendant who had used 4.3% of plaintiff's work in subsequent work commenting on abortion granted summary judgment because plaintiff was unable to advance a colorable case demonstrating harm to the market for the copyrighted work); *Hustler Magazine, Inc. v. Moral Majority, Inc.* 796 F.2d 1148 (9th Cir.1986) (granting defendant's motion for summary

judgment on use it had made in fundraising campaign of plaintiff's cartoon parody of fundamentalist minister); *Fisher v. Dees*, 794 F.2d 432 (9th Cir.1986) (granting summary judgment to disc jockey who had sung parody of plaintiff's 1950's song on commercial album); *Diamond v. Am-Law Publishing Corp.*, 745 F.2d 142 (2d Cir. 1984) (granting summary judgment to defendant who had published excerpts of copyrighted reply letter which had stated that it could be published only in its entirety).

## II. Copyright Claim.

### A. Law of the Case.

■ Before addressing the merits of CU's copyright claim, the Court must consider at the outset defendants' contention that the decision of the Second Circuit vacating the injunction entered by Judge Werker is the law of the case and further that since the Second Circuit's analysis of the four factors applicable to the question of fair use left no factual issues undecided that they are entitled to summary judgment on this claim.

Defendants' argument misconstrues the reach and import of the doctrine of law of the case. The doctrine involves distinct sets of problems, but its rules foster the common purpose to promote "consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478 (2d ed. 1981) ("Wright & Miller"); *see generally* 1B J. Moore, *Moore's Federal Practice* ¶ 0.404 (2d ed. 1984). Because the doctrine depends upon a prior final decision of an issue or claim by the court or by an appellate tribunal, "[r]ulings that simply deny extraordinary relief for

want of a clear and strong showing on the merits, or that are avowedly preliminary or tentative, do not trigger law of the case consequences." 18 Wright & Miller § 4478.

In vacating the preliminary injunction, the Second Circuit panel exercised its discretion in weighing the probability of CU's ultimate success on the merits and balanced the injury flowing from the denial of preliminary relief; it did not decide the ultimate merits of plaintiff's claim of copyright infringement. *See Board of Trade of the City of Chicago v. Commodity Futures Trading Commission*, 605 F.2d 1016, 1020 (7th Cir.1979), *cert. denied*, 446 U.S. 928, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980) (discretionary refusal to stay a preliminary injunction which rested on a tentative appraisal of the merits did not establish the law of the case); *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C.Cir.1974) (decision by trial or appellate court to grant or deny preliminary injunction does not constitute law of the case on further proceedings and does not limit or preclude the parties from litigating the claims on the merits); *Industrial Bank of Washington v. Tobriner*, 405 F.2d 1321, 1324 (D.C.Cir.1968) (appeal from denial of an injunction cannot be equated with an appeal from a final disposition on the merits) The decision by the Court of Appeals, therefore, does not preclude CU from fully airing its claims here.

### B. The Fair Use Exception to Copyright Violation.[7]

■ Section 106 of the Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. §§ 101–810, provides authors certain exclusive rights to their work.[8] Those rights are

---

7. A suit involving a copyright claim to which a defendant asserts a fair use defense usually involves a three-part determination of whether the copyright is valid, whether the subsequent user has infringed the copyright, and whether the subsequent user is nonetheless entitled to the fair use defense. While defendants seemingly argued before the Court of Appeals that the factual statements they made use of could not be copyrighted, 724 F.2d at 1049, they confined their arguments on this motion to the issue of whether their use was fair. Accordingly, the Court will assume *arguendo* that CU's copyright

is valid and that defendants' quotation of portions of the Consumer Reports evaluation infringed CU's copyright.

8. Section 106 provides in pertinent part:
 Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
 (1) to reproduce the copyrighted work in copies ...;
 (2) to prepare derivative works based upon the copyrighted work;

nevertheless subject to specific statutory limitations. Among these exceptions is fair use, "a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner." *Rosemont Enterprises, Inc. v. Random House Inc.*, 366 F.2d 303, 306 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967) (citing Ball, *Copyright and Literary Property* 260 (1974)). Congress endorsed this judicially created exception in section 107 of the Copyright Act.[9] Section 107 identifies four non-exclusive factors "that enable a court to apply an 'equitable rule of reason' analysis to particular claims of infringement." *Sony Corp. Of America v. Universal City Studios, Inc.*, 464 U.S. 417, 448, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984). The defense of fair use involves mixed questions of fact and law which may be decided, even on appeal, where the record contains facts sufficient to evaluate each of the statutory factors. *Harper & Row Publishers Inc. v. Nation Enterprises*, 471 U.S. 539, 560, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985). Defendants then will prevail on this motion for summary judgment only if (1) no factual issues remain to be resolved on any of the four factors necessary for the Court to make a determination of fair use and (2) after assessing and weighing the four fair use factors it is clear that defendants are entitled to the defense as a matter of law.

> (3) to distribute copies ... of the copyrighted work to the public....
> 17 U.S.C. § 106.

**9.** *See supra* n. 4.

**10.** Defendants' attempt to weigh this factor in their favor based on the supposedly public function to be served by disseminating their commercial speech, which concededly is protected by the First Amendment, is unavailing. The idea/expression dichotomy embodied in copyright " 'strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression.' " *Harper & Row Publishers Inc. v. Nation Enterprises,* 471 U.S. 539, 556, 105 S.Ct. 2218, 2229, 85 L.Ed.2d 588 (quoting the Second Circuit Court of Appeals, 723 F.2d at 203); *see* 1 Nimmer

### 1. The Purpose and Character of the Use.

Under this factor courts are to look to both the general purpose of the organization or infringing activity and to the "separate factor" of whether the activity was "commercial as opposed to nonprofit." *Harper & Row Publishers Inc. v. Nation Enterprises, supra,* 471 U.S. at 562, 105 S.Ct. at 2231. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Id.* Without doubt defendants made commercial use of CU's copyrighted evaluation thereby raising a presumption that the use is unfair. *Sony Corp. of America v. Universal Studios, Inc., supra,* 464 U.S. at 449 & n. 32, 451, 455 n. 40, 104 S.Ct. at 792 & n. 32, 793, 795 n. 400.

Moreover, inasmuch as advertising has traditionally been a disfavored use, the purpose of defendants' activity in no way mitigates the force of this presumption. *See* 3 M. Nimmer, *Nimmer on Copyright* § 13.-05[A] n. 24 (1983) ("Nimmer"); *cf. Harper & Row Publishers Inc. v. Nation Enterprises, supra,* 471 U.S. at 561, 105 S.Ct. at 2231 (fact that an article arguably is news and therefore a productive use is simply one factor in the analysis). The purpose and character of defendants' use, for profit and in an advertisement, weighs rather strongly against them.[10]

¶ 1.10[B]. The Supreme Court specifically rejected respondent's argument in *Harper & Row* that First Amendment concerns for matters of substantial public import were to be weighed again in making the fair use determination.

In view of the First Amendment protections already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use, we see no warrant for expanding the doctrine of fair use to create what amounts to a public figure exception to copyright. Whether verbatim copying from a public figure's manuscript in a given case is or is not fair use must be judged according to the traditional equities of fair use.

471 U.S. at 560, 105 S.Ct. at 2230–31.

2. Nature of the Copyrighted Work.

Informational works may be more freely used than creative works. *Diamond v. Am-Law Publishing Corp., supra,* 745 F.2d at 149. The articles in Consumer Reports consist of the results of tests, often designed by CU's staff engineers, along with other objective and subjective evaluations CU deems of importance to consumers. In the article on lightweight vacuum cleaners, for instance, CU designed objective tests to measure cleaning ability and capacity and evaluated more subjective qualities such as ease of use. Although Consumer Reports articles are not creative in the way that a work of fiction would be, CU's testing, research, and evaluation represent "a substantial investment of time and labor made in anticipation of financial return" which entitles them to protection. *MCA Inc. v. Wilson,* 677 F.2d 180, 182 (2d Cir.1981) (citing *Wainwright Securities, Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 96 (2d Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). While CU's articles might be susceptible of a wider range of fair use than truly creative works, the research and judgment involved merit more protection than that accorded mere compilation or cataloging. *See Financial Information Inc. v. Moody's Investors Service,* 751 F.2d 501, 509 (2d Cir.1984). While this second factor tips in defendants' favor, it does not merit great weight in light of defendants' concededly commercial use of CU's evaluations. *Id.* 751 F.2d at 509; *see Supermar-*

*ket of Homes, Inc. v. San Fernando Valley Board of Realtors,* 786 F.2d 1400, 1409 (9th Cir.1986) (defendants' identical commercial use of plaintiff's copyrighted multiple listing references weighed against them).

3. Amount and Substantiality of the Portion Used.

This factor may include a qualitative as well as a quantitative component. *Salinger v. Random House, Inc.,* 811 F.2d 90, 98–99 (2d Cir.1987). Defendants copied only a small number of the words contained in CU's published evaluation. Their copying would therefore appear to be insubstantial. Defendants nevertheless quoted CU's ultimate evaluation of the Powerteam 6910 against all the other tested vacuum cleaners and therefore arguably appropriated the most significant portion of the article. The quality of the component copied therefore undercuts the force this factor would warrant in defendants' favor based on the relatively few words actually copied.

4. Effect upon the Plaintiff's Potential Market.

The effect upon plaintiff's potential market for or value of the copyrighted work "emerges as the most important, and indeed, central fair use factor." 3 Nimmer § 13.05[A][4] at 13–78. "Fair use, when properly applied, is limited to copying by

Commercial speech is no more entitled to additional First Amendment consideration in making the fair use analysis than are newsworthy matters of arguably substantial public import. In *Financial Information Inc. v. Moody's Investors,* 751 F.2d 501 (2d Cir.1984), the court reversed the district court's determination that by making available important financial information copied wholesale from plaintiff's financial information service defendant had performed a valuable public function and was therefore entitled to prevail on the first factor of its fair use defense.

The fact that large financial institutions are willing to pay considerable sums of money to receive information hardly qualifies the selling of that information (again, for a substantial amount of money) as a public function.... To classify Moody's sales of its News Reports as a public function would, it

seems to us, state a rule that whenever there is a market for information, the paid delivery of goods to that market rises to a public function. While perhaps sound as a matter of economic theory, such a construction would distort the statutory "first factor" of fair use in the copyright context. We note, in addition, that presumably FII is able and willing to sell its Daily Bond Cards to anyone, and thus that no one with $279 per year need do without. 751 F.2d at 508–09. These decisions foreclose argument that the First Amendment expands defendants' defense of fair use. Defendants' protestations that Regina did not expect to promote the advertisements themselves or that Regina merely hoped to profit as a result of the information conveyed in the advertisements and not from commerce, with the attendant implication that its use was therefore not commercial, is pure sophistry.

others which does not materially impair the marketability of the work which is copied." 1 Nimmer § 1.10[D] at 1–87. The potential harm to be considered encompasses not only that which usurps the demand for the original market, but also harm to markets for derivative works. *Harper & Row Publishers Inc. v. Nation Enterprises, supra,* 471 U.S. at 568, 105 S.Ct. at 2235. More importantly, the factor "poses the issue of whether unrestricted and widespread conduct of the sort engaged in by the defendant (whether in fact engaged in by the defendant or by others) would result in a substantially adverse impact on the potential market for or value of the plaintiff's present work." 3 Nimmer § 13.05[A][4] at 13–79; *Harper & Row Publishers Inc. v. Nation Enterprises, supra,* 471 U.S. at 568, 105 S.Ct. at 2235 (quoting *Sony Corp. of America v. Universal City Studios, Inc., supra,* 464 U.S. at 451, 484 and n. 36, 104 S.Ct. at 794, and n. 36); *Salinger v. Random House, Inc., supra,* 811 F.2d at 96.

The fourth fair use factor must be considered here in a different posture than it was on appeal. To overturn the preliminary injunction entered in the district court, defendants had to establish that the district judge had abused his discretion in concluding that plaintiff had established a likelihood of success on the merits of its copyright claim, including some prospect of cognizable harm. In its decision vacating the injunction, the circuit panel stressed that CU had relied upon conclusory allegations by one of its officers as to the potentially detrimental effect upon future copyrighted works rather than the impact upon the particular copyrighted issue in which the evaluation of the Powerteam 6910 had appeared. 724 F.2d at 1051. CU had not alleged injury to any work currently copyrighted. To prevail on the instant motion, however, defendants must persuade the Court that even widespread use of CU's evaluations by other manufacturers would not, as a matter of law, adversely affect the circulation of Consumer Reports or impair the derivative market for the evaluations published in that magazine.

As yet, plaintiff has had no opportunity to present evidence on the questions of actual harm to the value of its copyright, whether in the primary or derivative markets, or the potential impact on those markets were the practice indulged by defendants to become widespread. While defendants present the common sense argument that their use could not have harmed the sale of the particular issue of Consumer Reports at issue or derivative use of the article, the argument does not address the question of the potential impact of widespread infringement by a number of manufacturers on the circulation of Consumer Reports. The resolution of those effects presents factual questions inappropriate to resolve on a motion for summary judgment.[11] In the absence of any evidence on these issues and based upon the presumption of harm that results from commercial use, the Court must weigh this fourth factor in favor of plaintiff.

Defendants have not proved that, on balance, they are entitled to the defense of fair use as a matter of law. The first factor, the purpose and character of defendants' use, weighs in CU's favor. Defendants did use a relatively insubstantial portion of the copyrighted work, which is primarily informational. The second and third factors would therefore seem to favor defendants. Nevertheless, their copying of the ultimate evaluation made by CU and its use in an advertising campaign undercuts the weight to be accorded these two factors. Defendants' concededly commercial use raises a presumption of harm. Although, as noted previously, the presumption of harm may be rebutted, defendants have not done so on the basis of the present submissions. The fourth factor then favors CU as well. Because in the balancing of factors on this motion, the

---

**11.** Relying on *Salinger v. Random House, Inc., supra,* 811 F.2d 90, 99 (2d Cir.1987), in which the Court of Appeals included within the fourth factor the potential market for Salinger's letters even though he had disavowed any intention to publish them during his lifetime, plaintiff now argues as well that the Court must consider the potential value to CU should it decide at some point to sell its endorsement.

scales do not tip decisively in their favor, defendants have not established that they are entitled to this equitable defense as a matter of law.

In sum, drawing the necessary inferences in plaintiff's favor, the Court concludes 1) that defendants have not demonstrated that they are entitled to prevail on the defense of fair use as a matter of law, and 2) that triable issues of fact concerning harm to CU's copyright remain. Accordingly, the Court denies defendants' motion for summary judgment on the copyright claim.

### III. Lanham Act.

Registering a proper noun as a trademark grants the owner the right to "prohibit the use of it so far as to protect the owner's good will," *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924), but it "does not reduce the mark to the exclusive possession of the registrant which may be guarding against any and all use by others." *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc.,* 299 F.2d 33, 36 (2d Cir. 1962).

A trademark is not, after all, a right "in gross" which is protectible in the abstract against any and all use by others irrespective of a lack of likelihood of confusion. In these circumstances, the courts weigh the right of a business to inform the public through advertising against the right of the public to be free from deception and confusion, and draw a line between collateral, informational use of a competitor's trademark and infringing use, i.e., that which causes likelihood of confusion.

J. Gilson, *Trademark Protection and Practice* ¶ 5.09[3] at 5–77 (1974). Because the protection accorded trademarks is limited, others may make unauthorized use of trademarks for a variety of lawful uses. *Id.* ¶ 5.09[2], [3]. CU thus has no absolute right under trademark law to prohibit Regina or others from referring to its trademark.

 This is not to say that CU must permit misleading references to its trademark which might injure its reputation. Section 43(a) of the Lanham Act broadly prohibits express or implied false representations made in connection with the sale of goods.[12] False representations in advertising occur when the challenged activities create a likelihood of confusion in the consuming public.[13] Confusion under the Lanham Act has traditionally referred to confusion as to the source or origin of goods or services in connection with which a trademark is used, but "courts have come to accept confusion as to sponsorship endorsement, or some other affiliation as satisfying the requirement." *Stop the Olympic Prison v. United States Olympic Committee,* 489 F.Supp. 1112, 1121–22 (S.D.N.Y.1980) (compiling cases). Subtle or sophisticated representations which though literally truthful nonetheless cause decep-

**12.** The statute provides:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely

to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). To make out a cause of action under the Lanham Act, plaintiff must establish involvement of goods or services, an effect on interstate commerce, and a false designation of origin or false description or representation of the goods or services. *Allen v. National Video Inc.,* 610 F.Supp. 612, 625 (S.D.N.Y. 1985).

**13.** Although the "touchstone of trademark infringement under the Lanham Act is likelihood of confusion," confusion is not necessarily an essential element of a cause of action under the Act inasmuch as it expressly proscribes false advertising and deceptive use of trademarks as well. *Stop the Olympic Prison v. United States Olympic Committee,* 489 F.Supp. 1112, 1122 (S.D.N.Y.1980).

tion are actionable. "Were it otherwise, clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed." *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir.1978).

Although the Second Circuit panel specifically noted that the Lanham Act may provide an appropriate remedy for the harm CU alleges to its reputation for objectivity and impartiality, as opposed to that it asserts to its copyright,[14] defendants nonetheless argue that they are entitled to summary judgment on this claim. The Court will consider in turn the four principal objections defendants have raised to the applicability of the Lanham Act to its actions.

### A. Confusion Concerning Origin or Sponsorship.[15]

Defendants periodically attempt to characterize the issue of confusion involved in this case as simply whether CU made the Powerteam 6910 vacuum cleaner featured in the advertisements or whether CU produced or sponsored the advertisements themselves. Memorandum In Support of Motion of Defendant The New Regina Corporation for Summary Judgment at 28–30, 33–34 ("Defendants' Memorandum"); Reply Memorandum of Defendant The New Regina Corporation in Support of its Motion for Summary Judgment at 5–6 ("Defendants' Reply Memorandum"). On the basis of that characterization, defendants

then contend that since plaintiff has produced no evidence that its commercials foster a clear inference that the goods, i.e. the vacuum cleaner or the advertisements, emanate from the plaintiff they are entitled to summary judgment.

Defendants' argument would appear to limit actions under section 43(a) to classic cases of palming off. As noted above and as the Second Circuit stated in this very case, however, "[i]n addition to prohibiting false representations, § 43(a) of the Lanham Act also proscribes advertisements which are not technically false, but which lead to a mistaken public belief that 'the mark's owner sponsored or otherwise approved the use.'" *Consumers Union of United States, Inc., v. General Signal Corp., supra*, 724 F.2d at 1052 (quoting *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema Ltd.*, 604 F.2d 200, 205 (2d Cir.1979). In *Dallas Cowboys Cheerleaders, supra*, the star of a pornographic movie had appeared in the film partially clad in a uniform that strongly resembled those worn by plaintiff's members. Holding that the district court had not erred in finding that plaintiff had established a likelihood of confusion within the meaning of the Lanham Act, the court noted that "[p]laintiff expect[ed] to establish on trial that the public may associate it with defendants' movie and be confused into believing that plaintiff sponsored the movie, provided some of the actors, *licensed defendants to use the uniform, or was in some other way connected with the production.*" 604 F.2d at 205 (emphasis supplied). *See Allen*

---

**14.** Plaintiff relies on portions of the decision in this case to argue that the Court of Appeals panel suggested no fewer than three times that CU should have the opportunity to establish this aspect of its case at trial. The excerpts on which it bases this argument follow.

We think CU's fear that consumers will assume that Regina purchased a CU endorsement is exaggerated and at least unsupported by the present record.
724 F.2d at 1050 n. 6 (citation omitted).
The only alleged injury which CU truly presses is that Regina's use may lead to public perception of *endorsement*. Truthful excerpting of CU's ratings cannot hurt CU *unless* the public perceives that CU sponsored the use. In such a case, Section 43(a) of the Lanham Act and the privacy statutes which prevent

unauthorized product endorsements are more appropriate. CU will have an opportunity to offer proof on this issue at trial and establish this aspect of its Section 43(a) claim if it can.
*Id.* 1051 n. 7 (emphasis in the original).
In addition to prohibiting false representations, § 43(a) of the Lanham Act also proscribes advertisements which are not technically false, but which lead to a mistaken belief that "the mark's owner sponsored or otherwise approved the use."
*Id.* at 1052 (citations omitted).

**15.** As defendants have noted, CU has confined its arguments on this motion to confusion concerning affiliation and no longer seems to contend that defendants falsely represented its evaluations.

*v. National Video, Inc.* 610 F.Supp. 612, 628–29 (S.D.N.Y.1985) ("even if the public does not believe that plaintiff actually appeared in the photograph, it may be led to believe by the intentional reference to plaintiff that he is somehow involved in or approves of their product"); *Tetley Inc. v. Topps Chewing Gum, Inc.* 556 F.Supp. 785, 789 n. 1 (E.D.N.Y.1983) (Lanham Act claim involves the "allegation that the consuming public will, as a result of purported infringement, be misled into thinking that there is some commercial relationship between the infringing and the infringed upon product"); *Geisel v. Poynter Products, Inc.,* 283 F.Supp. 261, 267 (S.D.N.Y. 1968) (" 'false representation,' whether express or implied, that a product was authorized or approved by a particular person is actionable Section 43(a)"). So here CU expects to establish that consumers will be misled into thinking that it had endorsed the Powerteam 6910, permitted the use of its trademark Consumer Reports in the advertisement for the Powerteam 6910, or somehow had involved itself commercially with Regina.[16]

Similarly, other courts have found implied misrepresentations concerning endorsement or affiliation actionable. In a case strikingly similar to the present controversy, cited with approval by the Second Circuit in this action, the Fifth Circuit held that a cause of action under section 43(a) existed based on advertisements that 1) directly misrepresented that the persons who had sworn out testimonials for its weight loss clinic were investigators for or working on behalf of plaintiff Better Business Bureau and 2) implied that the Bureau had endorsed the program. *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.,* 681 F.2d 397, 399 (5th Cir.1982). In reviewing the propriety of a preliminary injunction, the Fifth Circuit panel found, without the benefit of survey evidence, that the advertisements "impl[ied] that the Hickmans acted at the behest and under the direction of the Bureau, and that they found the Bureau's standard satisfied." 681 F.2d at 403. Although the advertisements nowhere stated that the clinics met the bureau's standards, the panel agreed with the district court that "the significant likelihood that the public may be led to believe that the Bureau has placed its imprimatur on the Center's program poses a threat of irreparable injury to the Bureau's carefully cultivated reputation of independence." *Id.; see also National Football League v. Governor of the State of Delaware,* 435 F.Supp. 1372, 1380 (D.Del.1977) (one may not advertise one's own services "in a manner which creates an impression in the mind of the relevant segment of the public that a connection exists between the services offered and the holder of the registered mark when no such connection exists"). As the Second Circuit recognized it and as this Court perceives the Lanham Act issue it is whether Regina's advertisements leave consumers with the impression that CU sponsored the commercial, endorsed the Powerteam 6910, permitted its name to be associated with that product in the commercial, or in some

---

**16.** The Court does not view *Dallas Cowboys Cheerleaders* as turning on the distinction that plaintiffs had had no relationship with the producers of the movie at issue. Here the only relationship between CU and Regina was that CU had tested several of Regina's products. Misrepresenting the status or extent of a relationship between plaintiff and defendants' products is no less actionable than stating that a relationship existed when none in fact did. *See Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.* 681 F.2d 397 (5th Cir.1982) (misrepresentations in advertisement about relationship between persons giving testimonials for weight loss center and plaintiff were actionable).

Nor is the Court persuaded by arguments that would distinguish *Dallas Cowboys Cheerleaders* and other cases relied upon by plaintiff as involving situations where plaintiffs' trademarks were found on or reproduced in defendants' products. The Lanham Act is intended in part to prevent unauthorized uses of trademarks when those uses create inaccurate consumer impressions about the relationship that exists between one manufacturer's goods and another's organization or products. Regina could not have attached to the Powerteam 6910 stickers saying "Endorsed by Consumer Reports" nor could it have printed messages to that effect on the product's packaging. Regina cannot evade responsibility for erroneous consumer impressions if consumers infer that same connection when plaintiff's trademark appears in a commercial featuring defendants' product rather than on the product itself:

other way involved itself commercially with Regina. Defendants' first argument, therefore, provides no basis for summary judgment.

### B. The First Amendment and the Lanham Act.

Defendants next argue that plaintiffs can present no issue under the Lanham Act that avoids fundamental inconsistency with the First Amendment. Their position distills to the following. New Regina as a manufacturer is privileged to disseminate truthful information concerning the Powerteam 6910. CU has published truthful information about the Powerteam 6910 in Consumer Reports which would be useful to consumers. New Regina may not only use CU's evaluation, but as well is privileged by the First Amendment to attribute the evaluation to CU inasmuch as CU's reputation for objectivity and impartiality substantiates that evaluation and is therefore an integral part of the protected commercial information to be relayed. CU in turn protests that such attributions would erode its hard-earned reputation which substantiates its evaluations.

Defendants' assertion that the Lanham Act should not be construed in a manner that would bring it into conflict with First Amendment interests is surely correct. *Stop the Olympic Prison v. United States Olympic Committee, supra,* 489 F.Supp. at 1124. Notwithstanding that admonition, the "First Amendment's concern for commercial speech is based on the informational function of advertising," and, "[c]onsequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it." *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 563, 100 S.Ct.

2343, 2350, 65 L.Ed.2d 341 (1980). Thus the "[m]isleading commercial speech" regulated by the Lanham Act "is beyond the protective reach of the First Amendment." *Vidal Sassoon, Inc. v. Bristol-Myers Co.,* 661 F.2d 272 276 n. 8 (2d Cir.1981); *see generally* J. Gilson, *Trademark Protection and Practice* § 5.09[5] (First Amendment is not a defense to actions for trademark infringement or section 43(a) violations). Neither an advertisement's relation to topics of current public debate nor the inclusion of factual information within it carry such commercial speech beyond the limited constitutional protection already afforded it. *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). Moreover, the content-neutral prohibitions of the Lanham Act against false and misleading advertising "do[ ] not arouse First Amendment concerns that justify alteration of the normal standard for ... relief." *Vidal Sassoon, Inc. v. Bristol-Myers Co., supra,* 661 F.2d at 276 n. 8.

Against this legal backdrop defendants argue the notion that "where it is undisputed that no appreciable number of consumers believe Consumer Reports sponsored the use, the First Amendment and the Lanham Act allow Regina to refer to Consumer Reports in its advertising." Defendants' Memorandum at 22. The argument, however, assumes the very outcome of this action. Whether defendants' advertisements confuse consumers as to CU's sponsorship of the commercials, its endorsement of the Powerteam 6910, or the sale of its trademark is precisely the issue to be decided. If plaintiff fails to prove by a preponderance of the evidence that defendants' advertisements create consumer confusion, there can be no false designation of origin and hence no violation of section 43(a). Under those circumstances, there would be no direct clash between section 43(a) and the First Amendment.[17]

---

17. One commentator has suggested that a non-infringing trademark or the non-infringing use of a trademark is entitled to the same First Amendment protections accorded purely factual information. 1 J. Gilson, *Trademark Protection and Practice* § 5.09[5] at 5–92. Should the trier of fact conclude that defendants' advertisements create no consumer confusion, a genuine First Amendment conflict might arise should CU still seek to prevent the use of its trademark based on its state law privacy cause of action. *See* N.Y.Gen.Bus.Law § 397. In that instance the

■ If defendants contend rather that plaintiff should not be allowed to proceed on its Lanham Act cause of action without some preliminary showing of the confusion central to the Lanham Act, lest CU be allowed to choke the protected flow of commercial information contained in their advertisements, they are mistaken. As the Second Circuit has already noted, First Amendment concerns for commercial speech do not justify altering standards or burdens of proof in Lanham Act cases. *Vidal Sassoon Inc. v. Bristol-Myers Co., supra,* 661 F.2d at 276 n. 8. The standard to apply on this motion is simply the ordinary one of whether any factual issues remain to be tried and whether defendants have shown that they are entitled to judgment as a matter of law.

### C. Evidence of Consumer Confusion.

The ultimate issue in this case is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled into believing that CU sponsored or otherwise approved the use of its mark in defendants' advertisements. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 115 (2d Cir.1984). Summary judgment therefore would be appropriate only if after viewing the parties' submissions the Court were satisfied that no such likelihood existed. *Id.* at 116; *see Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 918 (2d Cir.1980) (granting summary judgment to counterclaim defendant on issue of likeli-

hood of consumer confusion); *B & L Sales Associates v. H. Daroff & Sons, Inc.,* 421 F.2d 352, 354 (2d Cir.), *cert. denied,* 398 U.S. 952 (1970), (summary judgment granted defendant).

CU has commissioned and submitted surveys conducted by ASI Market Research Inc. to test consumer reaction to the Squid and Consumer Reports commercials. CU contends that the results of those surveys prove that defendants' advertisements created consumer confusion as to its sponsorship of or endorsement of the Powerteam 6910. In response, defendants argue first that the surveys are inadmissible and therefore may not be used to counter their motion for summary judgment and second that even accepting their validity, the survey results do not indicate sufficient levels of consumer confusion to warrant a trial.

#### 1. Admissibility.[18]

■ The starting point for determining the factual issue of whether an advertisement is likely to deceive the public is the public's reaction to the advertisement. *Standard & Poor's Corp. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 (2d Cir. 1982). It is well settled in this jurisdiction that surveys performed under actual market conditions generally are admissible to prove the likelihood of consumer confusion under section 43(a) of the Lanham Act on the basis that resort to such evidence is necessary and circumstantial guarantees of trustworthiness inhere in properly conducted surveys.[19] *Universal City Studios,*

---

Court would be obliged to decide whether Regina's attribution of the quoted evaluation to CU formed an integral part of the commercial message to be relayed. Were it so, the Court would then need to consider whether New York's privacy statute was nonetheless a proper time, place, manner restriction on defendants' commercial speech.

18. On a motion for summary judgment, a court may consider only admissible evidence. 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2721 (2d ed. 1982). Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence is relevant. Fed.R.Evid. 401. Any evidence the court deems to be relevant is admissible. Fed.R.Evid. 402.

Even relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. Fed.R. Evid. 403.

19. The trustworthiness of surveys depends upon foundation evidence that (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles, and (7) objectivity of the entire process was assured.

Inc. v. Nintendo Co., supra, 746 F.2d at 116; see Mattel Inc. v. Azrak-Hamway International, Inc., 724 F.2d 357, 361 (2d Cir.1983). Technical deficiencies in surveys conducted by reputable professionals usually go to the weight to be accorded the survey results rather than to its admissibility. DuPont v. Yoshida International, Inc., 393 F.Supp. 502, 518 (E.D.N.Y.1975); see Jellibeans, Inc. v. Skating Clubs of Georgia, Inc. 716 F.2d 833 844 (11th Cir. 1983) (poor sampling, inexperienced interviewers, and poorly designed question affected weight not admissibility); Squirtco v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir.1980) (technical deficiencies go to weight of survey evidence).

Despite the factual nature of the confusion inquiry and the general admissibility of survey evidence, however, "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source." Warner Bros. Inc. v. American Broadcasting Companies, Inc., 720 F.2d 231, 246 (2d Cir.1983). Defendants have asked the Court to exclude CU's surveys for having failed to meet the conditions for trustworthiness. Since plaintiff has demanded a trial by jury, the Court will make the preliminary determination defendants request.

In conducting its surveys, ASI utilized a standard methodology specifically adapted to test the concept of affiliation. Gerald Lukeman, the President of ASI has testified as to the survey design and has stated that both surveys were performed using conventional procedures similar to those that had been used for other clients under a variety of circumstances. Affidavit of Gerald Lukeman at ¶¶ 2–10 (sworn to January 10, 1986). On previous occasions, the Second Circuit has accepted as trustworthy and valid the methodology employed by ASI. See Vidal Sassoon, Inc. v. Bristol Myers Co., supra, 661 F.2d 272; American Home Products, Inc. v. Johnson & Johnson, supra, 577 F.2d 160.

Despite Lukeman's testimony, defendants contend that the proffered surveys are flawed and inadmissible. On this motion, however, defendants have offered no independent expert testimony to substantiate their criticisms of ASI's methodology nor have they submitted their own surveys to discredit ASI's results. Rather they argue that (1) the surveys employed closed-ended questions, (2) ASI employees were aware that the surveys were being conducted in anticipation of litigation, and (3) ASI did not survey a reliable sample of the relevant universe.

a. Misleading Closed-ended Questions.

Contrary to the inference defendants would have the Court draw, closed-ended questions are not inherently leading. Their use is accepted and universally employed to survey consumer perceptions. Lukeman Aff. ¶ 13. Courts have relied on closed-ended questions to determine consumer confusion on many occasions. See, e.g., Vidal Sassoon, Inc. v. Bristol Myers Co., supra, 661 F.2d 272; McNeilab, Inc. v. American Home Products Corp., 501 F.Supp. 517 (S.D.N.Y.1980); In McNeilab, Judge Lasker rejected the argument of one expert in consumer research and marketing that two closed ended survey questions, one of which allowed only a yes or no answer, were per se biased, misleading, and improper as "strain[ing] credulity." 501 F.Supp. at 528. As the court aptly noted, proof that a commercial "tends to mislead" does not require mathematical precision.

Although a closed-ended question might be misleading, as could be an open-ended question, here defendants have made only conclusory allegations that the ASI questions are misleading without specifying why, beyond that the question is closed-ended, it would bias the survey subject. In the absence of anything beyond conclusory assertions, the Court cannot exclude the ASI results on the basis that certain of the questions are assertedly misleading particularly in light of Lukeman's affidavit that

*Toys R Us, Inc. v. Canarsie, Kiddie Shop, Inc.*

**770**

the questions were carefully designed to be objective.[20] Lukeman Aff. ¶ 14.

### b. Knowledge of the Present Litigation.

Equally unavailing is defendants' argument that an awareness that CU had commissioned the survey in anticipation of using the results in the instant litigation tainted "each stage of the survey from conception to execution and negates its essential trustworthiness." Defendants' Memorandum at 44. As Lukeman testified, however, no one other than he and several senior ASI employees knew the purpose of the surveys or the identity of the client. Lukeman Aff. ¶ 23. Although the persons who administered the questions knew that the results might be used in a legal context, they did not know the purpose of the survey or the client for whom the survey was conducted. *Id.* While CU surely hoped that the results of the survey would substantiate its position in this litigation, that aspiration does not undermine the results of a survey designed and performed by a reputable consumer survey organization as long as the employees who administered the survey questions did not know the client or its position.

Finally, the fact that a consumer survey is conceived to explore a concept such as affiliation does not of itself undermine the survey results. The design of the survey determines its reliability. While a survey method that has been utilized previously to explore topics more commonly of interest to clients, such as consumer preference for one product over another, might carry with it an additional measure of reliability based upon the number of times it has been performed and the refinements that have been made, ASI's survey for CU is not necessarily unreliable simply because it focuses on a portion of perception less commonly evaluated.

### c. Improper Universe.

Finally, defendants contend that ASI selected an improper universe in that it interviewed only female cable television subscribers who already owned vacuum cleaners. As Lukeman testified, however, when testing matters of perception rather than of product quality, it is not necessary to target potential purchasers since the perceptions of the two groups will not vary. Lukeman Aff. ¶ 26. Lukeman further testified that based on his experience in performing consumer surveys, the perceptions of men and women would not vary when asked to answer questions for a "non need-based product." Lukeman Aff. ¶ 28. Moreover, since CU objects to confusion created among the public at large, the specific group Regina wished to reach in designing the commercial and in selecting the time slots during which it would be shown is not determinative. *See UpJohn Co. v. American Home Products Corp.,* 598 F.Supp. 550, 557 (S.D.N.Y.1984) (plaintiff's allegations apply to the possibility of confusion among all consumers). Defendants' remaining make-weight arguments concerning plaintiff's failure to obtain a probability sample and the reliability of the market in which the survey was conducted, also miss the mark. At most, they go to the weight and not the admissibility of the ASI surveys.

Defendants have neither rebutted Lukeman's testimony that the survey was objectively designed and professionally conducted nor undermined the survey results. At this point, the surveys appear reliable enough to support the qualitative, as opposed to strictly quantitative, inferences concerning consumer confusion necessary to determine a Lanham Act violation. Accordingly, the Court denies defendants' motion to exclude the survey results, without prejudice, and determines that it will consider the test results for the purposes of this motion.

The foregoing preliminary determination on the admissibility of the surveys does not finally resolve the evidentiary point. Should defendants wish to renew their ob-

---

**20.** Lukeman testified that questions were phrased using neutral language, that the questions were rotated so that an equal number of subjects heard the question asked positively and negatively, and that the questions at issue were not fully closed inasmuch as subjects could select a third option of "cannot tell." Lukeman Aff. ¶ 14.

jections on the basis of expert testimony or other relevant submissions, the Court would entertain a renewed motion to exclude the surveys after the completion of discovery or before trial. Defendants of course are free as well to introduce whatever relevant evidence they may have as to the weight to be accorded the survey results.

2. Levels of Consumer Confusion.

■ The ultimate issue of confusion is whether CU endorsed the Powerteam 6910, sponsored the commercial containing references to its evaluations, or permitted defendants to use its name in the commercials. As set forth in the ASI Report and Lukeman's affidavit, the November survey results showed that a number of test subjects who viewed the advertisements were confused about the relationship between Regina, the Powerteam 6910, and CU.

a. when asked whether CONSUMER REPORTS was "affiliated" with Regina, based on the Commercial, 19% of those viewing the "Squid" Commercial and 23% of those viewing the "Consumer Reports" Commercial answered "yes." The balance either could not tell 48%—"Squid"/22% "Consumer Reports"/ or answered "no" (33%/55%).

b. when asked whether, based on the Commercial, they thought CONSUMER REPORTS had been paid by Regina for the use of its name, 9% of the respondents viewing "Squid" answered "yes" and 25% viewing "Consumer Reports" said "yes".

c. when asked whether Regina had paid CONSUMER REPORTS for testing the Regina product, affirmative responses were obtained from 10% of the "Squid" viewers and 17% of the "Consumer Reports" viewers.

Plaintiff's Memorandum in Opposition to Defendants' Motion For Summary Judgment at 22. The second survey, conducted in February, replicated the earlier test results. That survey included another closed-ended question concerning authorization to use the Consumer Reports trademark.

a. 27% of those viewing "Squid" and 45% of those viewing "Consumer Reports" believed, based on the Commercial, that CONSUMER REPORTS had authorized the use of its name in the Commercials (those who responded "cannot tell" numbered 64%/46%);

b. 13% of those viewing "Squid" and 19% of those viewing "Consumer Reports" believed, based on the Commercial, that CONSUMER REPORTS was affiliated with Regina (those who could not tell numbered 52%/29%);

c. 15% of those viewing "Squid" and 16% of those viewing "Consumer Reports" believed, based on the Commercial, that CONSUMER REPORTS had been paid for the use of its name;

d. 14% of the "Squid" viewers and 15% of the "Consumer Reports" viewers believed, based on the commercials, that Regina had paid CONSUMER REPORTS for testing its product.

*Id.* at 23. Lukeman has testified that both sets or results are valid and statistically significant.[21] Lukeman Aff. ¶ 10.

The levels of confusion demonstrated by the ASI surveys fall within the range that other courts have found sufficient to support an inference of likelihood of confusion. *See RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1061 (2d Cir.1979) (consumer survey showing 15–20% rate of product confusion sustained district court finding in plaintiff's favor); *McNeilab, Inc. v. American Home Products Corp., supra,* 501 F.Supp. at 525–27 (showing that 23% of the respondents in an ASI survey were confused about claims made in a television commercial supported a permanent injunction and summary judgment); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 365 F.Supp. 707, 716 (S.D.N.Y.1973), *aff'd,* 523 F.2d 1331 (2d Cir. 1975) (levels of 7.7% of 520 people canvassed who perceived a business connection

---

**21.** Although Lukeman is not formally trained as a statistician, he testified that he conferred with formally trained statisticians employed by ASI who assured him that the results are statistically significant. Deposition of Gerald Lukeman at 262–265.

and 8.5% who confused names supported declaratory judgment and injunctive relief). Drawing inferences in favor of CU and accepting the ASI survey results as valid for the purposes of deciding this motion, CU has made a colorable demonstration that defendants' commercials have created a legally cognizable degree of consumer confusion as to whether CU is affiliated with Regina, whether CU authorized the use of its name in the commercials, or whether CU received payment from Regina to use its trademark in the commercials.

### D. Disclaimers Obviating Consumer Confusion.

Defendants' final contention is that because they have truthfully and meticulously disclosed that CU has not endorsed the Powerteam 6910 or any other products, CU may not maintain an action under the Lanham Act. The adequacy of a disclaimer, however, presents an issue of fact. ASI polled survey subjects who had viewed defendants' commercials, along with their disclaimers, as they had appeared on network television. Taking the survey results at face value, CU has produced evidence that the disclaimer has not adequately dispelled consumer confusion about the relationship between CU and Regina. It may be that even if CU succeeds in proving consumer confusion, requiring a more effective disclaimer would be CU's only remedy. This argument then is more properly addressed to the remedies available to CU should it eventually prevail rather than to whether it has sufficiently stated a cause of action under the Lanham Act. In any event, defendants' self-serving assertions that the disclaimer is adequate do not vitiate plaintiff's cause of action.

In summary, the ASI surveys commissioned by CU indicate that defendants' advertisements create consumer confusion as to the nature of the relationship between CU and Regina. At this point, none of the objections raised to the admissibility of those studies would warrant excluding them. The surveys indicate a cognizable degree of consumer confusion. Plaintiff, therefore, has raised a triable issue of fact

on this cause of action and the Court must deny that portion of defendants' motion seeking summary judgment on the Lanham Act claim.

Inasmuch as the issue of consumer confusion is relevant to plaintiff's state law causes of action for deceptive practices, trademark dilution, and false advertising, the Court also denies defendants' motion insofar as it seeks summary judgment on those claims.

### IV. Privacy Claims.

■ CU bases its final state law cause of action on section 397 of the New York General Business Law. As defendants point out, on appeal the Second Circuit held that "[w]e do not believe that the legislature intended that § 397 should apply to a situation where the non-profit corporation's business is that of evaluating products and where it widely disseminates the results." 724 F.2d at 1054. Effective July 30, 1986, however, the state legislature amended section 397 to include organizations such as CU which test and evaluate consumer products. As amended subsection one reads:

1. No person, firm, association or corporation shall use, for advertising purposes or for purposes of trade, the names, symbol, device or other identification of any non-profit corporation, association, society or organization organized exclusively for religious, benevolent, humane, charitable, educational, hospital, patriotic, fraternal or verterans purposes or to promote the study or the advancement of the arts or sciences or to sustain, encourage or promote the musical or performing arts *or to inform or educate the consumer by publishing and disseminating the results of tests and evaluations of goods and services,* without having first obtained the written consent of such non-profit corporation, association, society or organization. Any violation of this section shall be a misdemeanor.

N.Y.Gen.Bus.Law § 397 (addition to text indicated by underline). Plaintiff has requested both injunctive and compensatory

relief.[22] In the absence of any specific arguments that injunctive relief would now be moot, CU has stated a cause of action. The Court therefore denies, without prejudice, defendants' motion for summary judgment on this claim.

## CONCLUSION

The Court concludes that defendants have not demonstrated that they are entitled to prevail on the defense of fair use as a matter of law and that material issues of fact concerning harm to CU's copyright remain to be tried. Accordingly, defendants' motion for summary judgment on CU's copyright claim is denied. The ASI surveys submitted by plaintiff indicate that defendants' advertisements create consumer confusion as to the nature of the relationship that exists between CU and Regina. Inasmuch as none of the objections defendants raise to the surveys warrant excluding them at this point, plaintiff has raised a triable issue of fact on its Lanham Act claim. Accordingly, the Court denies that portion of defendants' motion seeking summary judgment on that cause of action. Because the issue of consumer confusion is relevant to plaintiff's state law causes of action for deceptive practices, trademark dilution, and false advertising, the Court also denies defendants' motion insofar as it seeks summary judgment of those claims. Finally, since defendants have not contended that injunctive relief based on amended section 397 would be moot, the Court denies summary judgment on this privacy cause of action. In sum, the Court denies defendants' motion in its entirety.

It is so ordered.

---

22. CU's claim for compensatory relief for defendants' unauthorized use of its trademark will depend on whether before the amendment became effective July 30, 1986, section 397 included consumer testing organizations such as CU.

Before trial, the parties will be permitted to brief the statute's applicability based on state court interpretations and the legislative history of the amendment to section 397.